# Exhibit A

# ASSET PURCHASE AGREEMENT

## BY AND AMONG

## RELADYNE WEST, LLC,

## CARDWELL DISTRIBUTING, INCORPORATED,

## UNITED FUEL SUPPLY L.L.C.,

## AND, FOR THE LIMITED PURPOSES SET FORTH HEREIN, THE JOINDER PARTIES

September 2, 2016

## ASSET PURCHASE AGREEMENT

THIS ASSET PURCHASE AGREEMENT (this "Agreement"), dated as of September 2, 2016, is by and among, RelaDyne West, LLC, a Delaware limited liability company (the "Purchaser"), Cardwell Distributing, Incorporated, a Utah corporation (the "Company"), United Fuel Supply L.L.C., a Nevada limited liability company and the shareholder of the Company (the "Shareholder") and for purposes of Sections 6.2, 6.3, 6.10 and Article V, each of Isaiah Kingston and Jacob Kingston (such individuals, each a "Joinder Party" and collectively, the "Joinder Parties"). Capitalized terms used herein and not otherwise defined have the meanings given to such terms in Article VIII below.

WHEREAS, the Company is engaged in the business of supplying lubricants, motor fuels and fleet fueling services to industrial, commercial and retail petroleum customers (the "Business");

WHEREAS, the Purchaser, the Company, the Shareholder and the Joinder Parties desire to enter into this Agreement, pursuant to which the Company proposes to sell to the Purchaser, and the Purchaser proposes to purchase from the Company, substantially all of the assets of the Company used in connection with the Business; and

WHEREAS, the Company, the Shareholder and the Joinder Parties acknowledge that the Purchaser is paying substantial consideration for the Assets and that payment of such consideration will inure to their benefit, and that their agreement to the terms of this Agreement (including Section 6.3) is a material inducement for the Purchaser to enter into this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants, agreements and understandings herein contained, the receipt and sufficiency of which is acknowledged, the parties agree as follows:

### ARTICLE I
### Sale and Transfer of Assets; Purchase Price; Closing

1.1.  Assets To Be Sold.  Upon the terms and subject to the conditions set forth in this Agreement, at the Closing, but effective as of the Effective Time, the Company will sell, convey, assign, transfer and deliver to the Purchaser, and the Purchaser will purchase and acquire from the Company, free and clear of any Liens, all of the Company's right, title and interest in all of the properties and assets of the Company as of the Closing, excluding only the Excluded Assets, including, but not limited to, the following (collectively, the "Assets"):

(a)  all fixed assets and items of machinery, equipment, furniture, and all other tangible personal property of the Company, including, without limitation, those items set forth on Schedule 1.1(a);

(b)  all rights existing under all Contracts to which the Company is a party, excluding those identified as Excluded Assets, but including, without limitation, those set forth on Schedule 1.1(b) (the "Purchased Contracts");



(c)     all files, lists and records of customers (whether past or current), suppliers, distributors and agents with respect to the Assets and Business, including, without limitation, quotation and purchase records and all books, records, ledgers, files, documents, correspondence, lists, studies and reports and other printed or written materials with respect to the Assets and Business;

(d)     all inventory, wherever located, including all raw materials, spare parts and all other materials and supplies to be used or consumed in the production of finished goods and finished goods inventory of the Company, including, without limitation, the inventory set forth on Schedule 1.1(d) (the "Inventory");

(e)     all claims, deposits, warranties, guarantees, refunds, causes of action, rights of recovery, rights of set-off and rights of recoupment of every kind and nature with respect to the Assets;

(f)     all of the Company's Intellectual Property, including, without limitation, the Intellectual Property identified on Schedule 1.1(f), the Company's telephone and fax numbers, domain name and website and any content (including any copyright therein), and all goodwill associated therewith;

(g)     all Permits, to the extent assignable, listed on Schedule 1.1(g);

(h)     all billed and unbilled accounts receivable and all correspondence with respect thereto, including, without limitation, all trade accounts receivable, notes receivable from customers, and all other obligations from customers, including, without limitation, the items listed on Schedule 1.1(h) (the "Accounts Receivable");

(i)     all insurance and warranty proceeds received after the Closing Date with respect to damage, non-conformance of or loss to the Assets or with respect to the Assets or the Assumed Liabilities;

(j)     all prepayments, vendor credits, rebates, prepaid expenses and similar assets and employee advances; and

(k)     the land owned by the Company legally described on Schedule 1.1(k) (collectively, the "Land"), together with (1) all buildings and improvements located on the Land (collectively, the "Buildings"), (2) all plumbing, lighting, heating, air conditioning, ventilating, water conditioning and other fixtures located in the Buildings or on the Land (collectively, the "Fixtures"), and (3) all easements and rights benefitting or appurtenant to the Land or the Buildings (collectively, the "Owned Real Property");

(l)     the leases (the "Real Property Leases") relating to real property (the "Leased Real Property" and collectively with the Owned Real Property, the "Real Property") described on Schedule 1.1(l); and

(m)     all goodwill and going concern value associated with the Company's operation of the Business.

- 2 -

1.2.   <u>Excluded Assets</u>.   Notwithstanding the foregoing <u>Section 1.1</u>, the Purchaser acknowledges and agrees that the Purchaser is not acquiring the following assets of the Company (collectively, the "<u>Excluded Assets</u>"):

(a)   all Cash;

(b)   the Company's rights under or pursuant to this Agreement and agreements entered into pursuant to this Agreement;

(c)   the Company's minute books, statutory books and company seal, if any;

(d)   all Permits that are not assignable;

(e)   all rights existing under each Contract set forth on <u>Schedule 1.2(e)</u>;

(f)   all business insurance policies;

(g)   all Employee Benefit Plans;

(h)   all Contracts related to Indebtedness, including any loans from the Shareholder to the Company; and

(i)   the assets set forth on <u>Schedule 1.2(i)</u>.

1.3.   <u>Liabilities</u>.

(a)   <u>Assumed Liabilities</u>.   At the Closing, the Company will assign and delegate to the Purchaser, and the Purchaser will assume, only the following Liabilities: (i) the Company's accounts payable set forth on <u>Schedule 1.3(a)(i)</u> (which Schedule will be updated immediately prior to the Closing) (the "<u>Accounts Payable</u>"), and (ii) the Company's obligations under the Purchased Contracts (collectively, the "<u>Assumed Liabilities</u>"). Notwithstanding the above, the Assumed Liabilities will not include any Liabilities relating to failure to perform, improper performance, or other breach, default or violation by the Company under any Purchased Contracts on or prior to the Closing Date. The Liabilities and obligations of the Company, the Shareholder, or their Affiliates other than the Assumed Liabilities, (collectively, the "<u>Excluded Liabilities</u>") will not be assumed by the Purchaser.   The Excluded Liabilities will include the Outstanding Transaction Expenses, which the Company and Shareholder will pay in the Ordinary Course of Business.

(b)   <u>Excluded Liabilities</u>.   The Excluded Liabilities will remain the sole responsibility of and will be retained, paid, performed and discharged solely by the Company.   For the avoidance of doubt, the Excluded Liabilities will expressly include (i) all Liabilities that are caused by the actions or inactions of the Company with respect to the Purchased Contracts on or prior to the Closing Date, (ii) all Liabilities related to Taxes, (iii) all product liability, all returns, and all warranty liability with respect to sales made by the Company, (iv) all Liabilities under Contracts related to Indebtedness (including outstanding checks drawn on the Company's accounts), (v) all Liabilities that arise out of or in connection with any violation of or non-compliance of the Company

with any applicable Law, (vi) all refunds due to third parties, which obligations were incurred or relate to events that occurred on or prior to the Closing Date, (vii) all payroll related liabilities including accrued payroll, accrued employee bonuses and accrued commissions, and (viii) any other Liabilities of the Company not specifically included in the Assumed Liabilities.

1.4.    Purchase Price.  The consideration for the Assets will be the sum of (i) Nineteen Million Dollars ($19,000,000) (the "Enterprise Value"), and (ii) adjusted (plus or minus) by the Working Capital Adjustment as provided in Section 1.7 hereof (collectively, the "Purchase Price").

1.5.    Payment of Purchase Price.  On the Closing Date, and subject to the conditions set forth in this Agreement, the Purchase Price will be paid as follows:

(a)    the Purchaser will pay off the Company's Indebtedness (the "Indebtedness Amount") with such payment being made to the holders of such Indebtedness pursuant to payoff letters in forms acceptable to the Purchaser;

(b)    the Purchaser will pay an amount equal to Five Hundred Thousand Dollars ($500,000) (the "Escrow Amount") to the Escrow Agent, with such funds to be held in an escrow account pursuant to the terms and conditions of an escrow agreement by and among the Purchaser, the Company, and the Escrow Agent (the "Escrow Agreement"); and

(c)    the Purchaser will pay to the Company, by wire transfer of immediately available funds to such account as is designated by the Company, an aggregate amount equal to the sum of:

(i)    the Enterprise Value;

(ii)    minus the Indebtedness Amount;

(iii)    minus the Escrow Amount;

(iv)    plus or minus the Estimated Working Capital Adjustment.

1.6.    The Closing.

(a)    The closing of the purchase and sale of the Assets and the transactions relating thereto (the "Closing"), will take place by an exchange of electronic signature pages on September 16, 2016; provided, however, that notwithstanding such date, the parties acknowledge and agree that in no event will the Closing occur prior to the time and date that all of the conditions to Closing set forth in Article II are either satisfied or waived (other than conditions which, by their nature, are to be satisfied on the Closing Date), or at such other time, date or place as agreed by the parties in writing (the date of the Closing, the "Closing Date"). The effective time of the Closing is 12:01 a.m., Mountain time, on the Closing Date (the "Effective Time").



(b)     At the Closing, unless waived (to the extent such conditions can be waived), each party shall deliver to the appropriate Persons each of the documents, certificates, instruments or evidences of satisfaction of conditions required to be delivered by such Party as a condition to the Closing pursuant to Article II hereof.

1.7.    Working Capital Adjustment.  The Purchase Price will be subject to adjustment as provided in this Section 1.7 (the "Working Capital Adjustment").

(a)     Working Capital.  "Working Capital" means the Current Assets of the Company (excluding Cash), minus the Current Liabilities of the Company (excluding Indebtedness), as of the applicable date, determined in a manner consistent with GAAP and the methodology set forth on Exhibit A.

(b)     Estimated Working Capital Adjustment.  Within three (3) business days prior to the Closing Date, the Company will deliver to the Purchaser an estimated statement of the Working Capital as of the close of business on the day prior to the Closing Date (the "Estimated Working Capital").  Provided that the Estimated Working Capital is acceptable to the Purchaser, if the Estimated Working Capital is greater than the Working Capital Target, then, on the Closing Date, the Purchase Price will be increased on a dollar-for-dollar basis by an amount equal to the Estimated Working Capital less the Working Capital Target, and if the Working Capital Target is greater than the Estimated Working Capital, then, on the Closing Date, the Purchase Price will be decreased on a dollar-for-dollar basis by an amount equal to the Working Capital Target less the Estimated Working Capital (such adjustment, the "Estimated Working Capital Adjustment").

(c)     Closing Working Capital Adjustment.

(i)     No later than one hundred fifty days (150) days after the Closing Date, the Purchaser will prepare and deliver to the Company a reasonably detailed statement (the "Closing Working Capital Statement") of the Working Capital as of the close of business on the day prior to the Closing Date (the "Closing Working Capital").  Following the Closing Date, the Purchaser will cooperate with the Company and its advisors in making available to the Company and its advisors such books, records, financial information, work papers and supporting data, as reasonably requested by the Company, in connection with the Company's review of the Closing Working Capital.

(ii)     The Company may deliver a written notice to the Purchaser no later than twenty (20) days following the Company's receipt of the Closing Working Capital Statement stating whether the Company has any objections to the Closing Working Capital, describing in reasonable detail any objections thereto.  Failure to give a timely objection notice (or written notification from the Company that it has no objection to the Closing Working Capital Statement) will constitute acceptance and approval of the Closing Working Capital set forth therein, and such Closing Working Capital will be final and binding upon the parties.



(iii)    If the Company notifies the Purchaser of any objection to the Closing Working Capital Statement within the time period set forth in Section 1.7(c)(ii), the Purchaser and the Company will attempt in good faith to reach an agreement as to the matter in dispute.  If such parties have failed to resolve any such disputed item within ten (10) days after receipt of timely notice of such objection, then any such disputed item will be submitted to and determined by an independent accounting firm mutually agreed upon by the Purchaser and the Company (the "Independent Accounting Firm"); provided, however, the parties may mutually agree on an extended period to resolve any such dispute before submitting it to the Independent Accounting Firm.  The Independent Accounting Firm will be given reasonable access to all of the records of the Company and the Purchaser to resolve any disputed item regarding the Closing Working Capital Statement and will be instructed to submit its determination in writing with respect to any disputed matters to the Purchaser and the Company within twenty (20) days.  The Independent Accounting Firm will address only those items properly disputed in accordance with Section 1.7(c)(ii) and the Independent Accounting Firm may not assign a value greater than the greatest value or lower than the lowest value for any such item claimed by the Purchaser, on the one hand, or the Company, on the other hand.  The Company and the Purchaser will be entitled to present any materials they deem appropriate to the Independent Accounting Firm, including a meeting, with all parties present (to the extent such parties desire to be present in such meeting), to discuss their position.  The fees and expenses of the Independent Accounting Firm incurred in resolving the disputed matter will be equitably apportioned by the Independent Accounting Firm based on the extent to which the Purchaser, on the one hand, or the Company, on the other hand, is determined by the Independent Accounting Firm to be the prevailing party in the resolution of each such disputed matter.  The Closing Working Capital Statement properly disputed under this Section 1.7(c)(iii) will, after resolution of such dispute pursuant to this Section 1.7(c)(iii), be final, binding and conclusive on all parties.

(iv)    If the Closing Working Capital as finally determined is greater than the Estimated Working Capital used for purposes of the Estimated Working Capital Adjustment, the Purchaser will pay such excess on a dollar-for-dollar basis to the Company in immediately available funds, and if the Estimated Working Capital is greater than the Closing Working Capital, the Company and the Shareholder will, jointly and severally, pay such excess on a dollar-for-dollar basis to the Purchaser in immediately available funds (such final adjustment, the "Closing Working Capital Adjustment").  In the Purchaser's sole discretion, any payment due from the Company and the Shareholder may be paid from the Escrow Amount.  All payments pursuant to this Section 1.7(c)(iv) will be made within five (5) days after the determination of Closing Working Capital becomes final and binding.

(v)    During the 120-day period following the Closing Date (the "Collection Period"), Purchaser will use commercially reasonable efforts in accordance with its ordinary custom and practice (which efforts will not in any



event require initiating of litigation, retaining attorneys or collection agencies to collect) to collect all accounts receivable of the Company as of the Closing ("Acquired Receivables"). Within 30 days after the end of the Collection Period, Purchaser shall prepare and deliver to the Company a statement (the "AR Statement") setting forth Purchaser's aggregate collections of Acquired Receivables during the Collection Period (the "AR Collections"). To the extent AR Collections are less than the amount of Acquired Receivables included within the Closing Working Capital, as finally determined hereunder, (1) the Company and the Shareholder, jointly and severally, shall pay to Purchaser, an amount equal to such shortfall within five business days after delivery of the AR Statement in immediately available funds by wire transfer to such bank account as may be designated by Purchaser and (2) Purchaser shall assign to the Company the uncollected Acquired Receivables for Company to collect for its own account.

1.8.    Purchase Price Allocation.  The Purchaser and the Company agree that the Purchase Price shall be allocated among the Purchased Assets for all purposes (including Tax and financial accounting) as shown on the allocation schedule (the "Allocation Schedule"). A draft of the Allocation Schedule shall be prepared by Purchaser and delivered to the Company within 45 days following the Closing Date. If Seller notifies Buyer in writing that Seller objects to one or more items reflected in the Allocation Schedule, the Purchaser and the Company shall negotiate in good faith to resolve such dispute; provided, however, that if the Purchaser and the Company are unable to resolve any dispute with respect to the Allocation Schedule within 90 days following the Closing Date, such dispute shall be resolved by the Independent Accounting Firm. The fees and expenses of such accounting firm shall be borne equally by the Purchaser and the Company. The Purchaser and the Company shall file all Tax Returns (including amended returns and claims for refund) and information reports in a manner consistent with the Allocation Schedule. Any adjustments to the Purchase Price pursuant to Section 1.7 herein shall be allocated in a manner consistent with the Allocation Schedule.

1.9.    Post-Closing Cooperation.  If any consent of a third party is necessary for the sale, transfer or assignment of any Asset to the Purchaser hereunder and such consent is not obtained as of Closing or if such assignment is not permitted irrespective of consent, then (a) any sale, transfer or assignment of such Asset shall not be effective unless and until consent reasonably acceptable to the Purchaser has been obtained, and (b) the Company and the Shareholder will cooperate with the Purchaser following the Closing Date to obtain any such consent and in any reasonable arrangement designed to provide the Purchaser with the rights and benefits (subject to the obligations) under any such Asset, including enforcement for the benefit of the Purchaser of any and all rights of the Company and the Shareholder against any other party arising out of any breach or cancellation of any contract by such other party and, if requested by the Purchaser, acting as an agent on behalf of the Purchaser or as the Purchaser may otherwise reasonably require.



## ARTICLE II
## Closing Conditions

2.1.  Conditions to the Purchaser's Obligations.  The obligation of the Purchaser to consummate the transactions contemplated by this Agreement on the Closing Date is subject to the satisfaction, prior to or on the Closing Date, of each of the following conditions:

(a)  Representations and Warranties.  Each of the representations and warranties made by the Company and the Shareholder will be accurate and correct in all respects on the Closing Date.

(b)  Compliance with Covenants, Obligations and Agreements.  The Company, the Shareholder and the Joinder Parties will have performed and complied in all respects with all of the covenants, obligations and agreements contained in this Agreement to be performed and complied with by the Company, the Shareholder and the Joinder Parties on or prior to the Closing Date.

(c)  Bring Down Certificate.  Each of the Company, the Shareholder and the Joinder Parties will have signed and delivered to the Purchaser a certificate, dated as of the Closing Date, certifying that the conditions set forth in Section 2.1(a) and Section 2.1(b) have been satisfied (the "Bring Down Certificate").

(d)  Consents and Other Items.  The Company will have obtained and delivered to the Purchaser (i) any and all written consents and authority necessary or appropriate to permit the Company to sell the Assets and to consummate the other transactions contemplated hereby, (ii) evidence reasonably satisfactory to the Purchaser that all necessary and appropriate notices have been given to third parties, and (iii) estoppel certificates, non-disturbance agreements and consents from third parties to leases, subleases, Contracts and agreements of the Company necessary or appropriate to permit the Purchaser to purchase the Assets, operate the leased Assets undisturbed and to consummate the other transactions contemplated hereby, in each case in form and substance reasonably satisfactory to the Purchaser.

(e)  No Injunction.  No temporary restraining order, preliminary or permanent injunction or other order or decree by any court of competent jurisdiction that prevents the consummation of the transactions contemplated hereby or imposes material conditions with respect thereto will have been issued and remain in effect and no action will have been taken, and no statute, rule or regulation will have been enacted, by any Government Entity that would prevent the consummation of the transactions contemplated hereby or impose material conditions with respect thereto.

(f)  No Proceeding.  Since the date of this Agreement, there will not have been commenced or threatened against either Company, the Shareholder or either Joinder Party or any of their respective Affiliates any action, arbitration, audit, hearing, investigation or suit (i) including any challenge to, or seeking damages or other relief in connection with, any of the transactions contemplated by this Agreement or (ii) that may have the effect of preventing, delaying, imposing limitations or conditions on or



otherwise interfering with any of the transactions contemplated by this Agreement or the Purchaser's ability to use the Assets and operate the Business.

(g)     Financing.  The Purchaser will have obtained on terms and conditions satisfactory to them, in its sole discretion, the financing it needs in order to consummate the transactions contemplated by this Agreement and to fund their working capital requirements after the Closing.

(h)     Release of Liens.  The Company will have obtained releases of all Liens on the Assets, including, but not limited to, those set forth on Schedule 3.7.  The Company will deliver such payoff letters, discharges of Liens, releases of guarantees and other releases as are reasonably requested by the Purchaser.

(i)     Purchaser's Due Diligence.  The Purchaser shall have completed any and all due diligence related to the Company and the Business (including, without limitation, with respect to the Company's and the Business' financial, real estate, environmental, tax, employee and legal matters) to the satisfaction of the Purchaser in its sole discretion.

(j)     No Material Adverse Change.  As of the Closing Date, there will not have occurred in the opinion of the Purchaser, in its sole discretion, any material adverse change in the Business, including, without limitation, it operations, prospects, financial condition, Assets or Liabilities (contingent or otherwise) since the date of this Agreement.

(k)     Closing Documents.  At the Closing, the Company will have delivered, or will have caused to be delivered, to the Purchaser all of the following documents:

(i)     a certificate from the Secretary of the Company certifying as to correct and complete copies of (A) the Company's Organizational Documents, (B) incumbency and signatures of officers of the Company, and (C) resolutions of the Shareholder and board of directors of the Company authorizing the execution and delivery of this Agreement and the other documents to which the Company will be a party and the taking of any and all actions reasonably necessary to consummate the transactions contemplated herein and therein;

(ii)     a certificate issued by the Utah Secretary of State, as of a date reasonably acceptable to the Purchaser, as to the good standing of the Company, in such state and certificates issued by the Secretary of State in each jurisdiction referred to on Schedule 3.1, as to the good standing of the Company, in each case as of a date reasonably acceptable to the Purchaser;

(iii)     the Escrow Agreement, executed by the Company;

(iv)     the Bring Down Certificate, executed by the Company, the Shareholder and the Joinder Parties;

(v)     a bill of sale, assignment and assumption agreement (the "Bill of Sale"), executed by the Company;

- 9 -



(vi)   assignments of all of the Intellectual Property rights (the "IP Assignments"), executed by the Company;

(vii)   employment agreements, executed by such employees of the Company as identified by the Purchaser in its sole discretion (collectively, the "Employment Agreements");

(viii)   warranty deeds executed by the Company conveying the Owned Real Property to Purchaser, free and clear of all Liens;

(ix)   real property lease agreements, executed by such Persons as determined by the Purchaser in its sole discretion (the "Leases");

(x)   an affidavit by the Company and the Shareholder indicating that on the Closing Date there are no outstanding, unsatisfied judgments, tax liens or bankruptcies against or involving the Company or the Owned Real Property; that there has been no skill, labor or material furnished to the Owned Real Property for which payment has not been made or for which mechanics' liens could be filed; and that there are no other unrecorded interests in the Owned Real Property, together with whatever standard owner's affidavit and/or indemnity that may be required by the Title Company to issue an owner's policy of title insurance with the standard exceptions waived;

(xi)   non-foreign affidavits, properly executed and in recordable form, containing such information as is required by IRC Section 1445(b)(2) and its regulations executed by the Company;

(xii)   surveys of the Owned Real Property in form acceptable to Purchaser in its sole discretion;

(xiii)   commitments for title insurance for each Owned Real Property; and

(xiv)   such other documents relating to the transactions contemplated by this Agreement as the Purchaser may reasonably request.

2.2.   **Conditions to the Company's Obligations.**   The obligation of the Company to consummate the transactions contemplated by this Agreement on the Closing Date is subject to the satisfaction, prior to or on the Closing Date, of each of the following conditions:

(a)   **Representations and Warranties.**   Each of the representations and warranties made by the Purchaser will be accurate and correct in all respects on the Closing Date.

(b)   **Compliance with Covenants, Obligations and Agreements.** The Purchaser will have performed and complied in all respects with all of the covenants, obligations and agreements contained in this Agreement to be performed and complied with by Purchaser on or prior to the Closing Date

- 10 -

(c)    Bring Down Certificate.   The Purchaser will have delivered to the Company a certificate signed by an officer of the Purchaser, dated as of the Closing Date, certifying that the conditions set forth in Section 2.2(a) and Section 2.2(b) have been satisfied (the "Purchaser's Bring Down Certificate").

(d)    Closing Documents.  At the Closing, the Purchaser will have delivered to the Company all of the following documents:

(i)    a good standing or similar certificate of the Purchaser from the State of Delaware, as of a date reasonably acceptable to the Company;

(ii)    certified copies of the resolutions duly adopted by the Purchaser's board of managers authorizing the execution, delivery and performance of this Agreement, all other agreements or instruments contemplated hereby and the consummation of the transactions contemplated hereby;

(iii)    the Escrow Agreement, executed by the Purchaser;

(iv)    the Bill of Sale, executed by the Purchaser;

(v)    the IP Assignments, executed by the Purchaser;

(vi)    the Employment Agreements, executed by the Purchaser;

(vii)    the Leases, executed by the Purchaser; and

(viii)    the Purchaser's Bring Down Certificate, executed by the Purchaser.

## ARTICLE III
## Representations and Warranties of the Company and the Shareholder

As a material inducement to the Purchaser to enter into this Agreement and consummate the transactions contemplated hereby, the Company and the Shareholder, jointly and severally, hereby represent and warrant to the Purchaser as follows:

3.1.    Organization and Qualification; Capitalization.    The Company is a duly incorporated, validly existing corporation in good standing under the Laws of the State of Utah. The Company has all the requisite power, authority and capacity to own, lease and operate its assets and to carry on the Business as the same was and is now being conducted.  The Company is qualified as a foreign corporation and is in good standing in all jurisdictions where the conduct of the Business or the ownership of its assets requires such qualification, and Schedule 3.1 sets forth all such jurisdictions.  The Company has delivered to the Purchaser complete and correct copies of its Organizational Documents now in effect, and the Company is not in default under or in violation of any provision of its Organizational Documents.  A copy of the minute books containing the records of the meetings and written actions of the directors and shareholders of the Company have been furnished to the Purchaser and are correct and complete.  The Company has no subsidiaries.  The Company does not own directly or indirectly any equity ownership interest in any other Person.  The Shareholder owns one hundred percent (100%) of the

- 11 -

outstanding equity interests of the Company, and no Person has any right to acquire any equity interest in the Company.

    3.2.  <u>Power and Authority; Enforceability</u>.  Each of the Company and the Shareholder has all power and authority to enter into and consummate the transactions contemplated by this Agreement and any ancillary agreements entered into in connection with this Agreement (collectively, the "<u>Transaction Documents</u>") to which it is a party.  The execution and delivery of the Transaction Documents by the Company and the Shareholder to which each is a party and the consummation of the transactions contemplated by the Transaction Documents to which each are a party have been duly authorized by all necessary company and other action on the part of the Company and the Shareholder.  This Agreement has been duly executed and delivered by the Company and the Shareholder and each of the other Transaction Documents to which any of the Company or the Shareholder is a party have been duly executed and delivered by the Company and the Shareholder as appropriate, and such Transaction Documents constitute the legal, valid and binding obligations of each of the Company and the Shareholder, respectively, enforceable against each of the Company and the Shareholder in accordance with their respective terms, except to the extent that (a) their enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other Laws affecting the enforcement of creditor's rights generally, and (b) the availability of equitable remedies is subject to the discretion of the court before which any such proceeding may be brought.

    3.3.  <u>No Conflict</u>.  Neither the execution and delivery of this Agreement, nor the performance of the provisions hereof to be performed by the Company or the Shareholder, nor the transactions contemplated hereby (a) violate or conflict with the Company's Organizational Documents; (b) violate or conflict with any Law, rule, regulation, writ, judgment, injunction, decree, determination, award or other order of any court, government or governmental agency or instrumentality, domestic or foreign, that is applicable to the Company; or (c) will result in a breach of any of the terms or conditions of, or constitute a default under, any mortgage, note, bond, indenture, agreement, license or other instrument or obligation to which the Company or the Shareholder is a party or by which any of their respective properties or assets may be bound or affected.  With respect to the Company and the Shareholder, no consent, approval, order or authorization of or from, or registration, notification, declaration or filing with any individual or entity, including, without limitation, any Government Entity, is required in connection with the execution, delivery or performance of this Agreement by the Company and the Shareholder or the consummation by the Company and the Shareholder of the transactions contemplated herein.  Except as set forth in <u>Schedule 3.3</u>, neither the Shareholder nor the Company is or will be required to give any notice to or obtain any consent from any Person in connection with the execution and delivery of this Agreement or the consummation or performance of any of the transactions contemplated herein.

    3.4.  <u>Financial Statements; Undisclosed Liabilities</u>.

        (a)  Attached hereto as <u>Schedule 3.4(a)</u> are (a) the audited balance sheet of the Company as of December 31, 2015 and the audited income statement and statement of cash flows for the twelve (12) month period ended December 31, 2015, (b) the audited balance sheet of the Company as of December 31, 2014 and the audited income statement and statement of cash flows for the twelve (12) month period ended December 31, 2014, and (c) the unaudited balance sheet of the Company as of June 30, 2016 (the "<u>Most</u>

Recent Balance Sheet") and the unaudited income statement and statement of cash flows for the six-month period then ended. All of the foregoing financial statements are collectively referred to as the "Financial Statements."

(b)     The Financial Statements have been prepared in accordance with GAAP and fairly present the financial condition of the Company and the accounting practices have been consistently applied for all periods represented by the Financial Statements. The Company's books and records are complete and correct and accurately reflect all of the assets, liabilities, transactions and results of operations of the Company and the Financial Statements have been prepared and presented based upon and in conformity therewith.

(c)     The Company has no Liabilities or Indebtedness except (i) those disclosed or reserved against on the Most Recent Balance Sheet, and (ii) those incurred after the date of the Most Recent Balance Sheet in the Ordinary Course of Business.

3.5.     <u>Accounts Receivable; Inventory</u>.  All Accounts Receivable reflected on the Most Recent Balance Sheet and the Accounts Receivable included in the Working Capital are valid receivables, collectible, and represent arm's length transactions in the Ordinary Course of Business. The reserve for doubtful accounts with respect to such Accounts Receivable has been determined in accordance with GAAP. There is no contest, claim, defense or right of setoff with any account debtor of the Company relating to the amount or validity of such Accounts Receivable. Each of the Accounts Receivable are collectible in the Ordinary Course of Business in accordance with the agreed upon terms of payment with each respective obligor. The Inventory of the Company reflected in the Most Recent Balance Sheet and the Inventory included in the Working Capital consists of items held for resale that are of a quality and quantity usable and saleable (without discount or price reduction) and are of the type, nature and quantity that the Company has sold or utilized within the one-year period prior to the date of this Agreement. The method of valuing such Inventories, and the reserves with respect thereto, is consistent with past practice and in accordance with GAAP. The values of Inventory known to the Company to be obsolete or be below standard quality have been written down on the Company's books. All of the Inventory is located in the Company's facilities at the Real Property.

3.6.     <u>Absence of Certain Developments</u>.  Except as set forth on <u>Schedule 3.6</u> (other than actions and conduct relating to the transactions contemplated by this Agreement), since January 1, 2016, the Company has conducted business only in the Ordinary Course of Business and has not:

(a)     discharged or satisfied any Liens or paid any material obligation or Liability, other than current Liabilities paid in the Ordinary Course of Business, or cancelled, compromised, waived or released any right or claim;

(b)     sold, assigned, licensed or transferred any of its assets, except for sales in the Ordinary Course of Business, or mortgaged, pledged or subjected its assets to any Lien;



(c)     sold, assigned, transferred, abandoned or permitted to lapse any licenses or permits;

(d)     suffered any extraordinary loss, damage, destruction or casualty loss or waived any rights of value, whether or not covered by insurance and whether or not in the Ordinary Course of Business;

(e)     borrowed any amount, except the Indebtedness set forth on Schedule 3.21, or incurred or become subject to any Liabilities, except current Liabilities incurred in the Ordinary Course of Business and Liabilities under Contracts entered into in the Ordinary Course of Business;

(f)     commenced any litigation or binding dispute resolution process or settled or compromised any pending or threatened suit, action or claim;

(g)     entered into any other material transaction, other than in the Ordinary Course of Business;

(h)     changed its policies or practices with regard to cash management, collection of receivables, payment of payables, maintenance of inventory, pricing and credit; or

(i)     experienced a Material Adverse Effect.

3.7.    Title to Assets; Sufficiency.  The Company owns all of the machinery, equipment, furniture, inventory, records, and other assets that are located in the Real Property or that are reflected as owned in the books and records of the Company, including all assets reflected in the Most Recent Balance Sheet (except for assets held under capital leases disclosed in this Section 3.7 and personal property sold since the date of the Most Recent Balance Sheet, as the case may be, in the Ordinary Course of Business) and all of the assets purchased or otherwise acquired by the Company since the date of the Most Recent Balance Sheet (except for personal property acquired and sold since the date of the Most Recent Balance Sheet in the Ordinary Course of Business and consistent with past practice).  The Company has good and marketable fee simple title to the Owned Real Property.  All assets acquired outside the ordinary course of business (as such term is used in Section 9-320(a) of the Uniform Commercial Code) by the Company since December 31, 2010 are identified in Schedule 3.7 (identifying the acquisition date, the exact legal name of the seller, and a description of the acquired assets).  Except as set forth on Schedule 3.7, the Assets are free and clear of all Liens.  The Assets constitute all of those assets necessary to conduct the Business as presently conducted.  The Assets are sufficient for the continued conduct of the Business after the Closing in substantially the same manner as conducted by the Company prior to the Closing Date.

3.8.    Tax Matters.  Except as set forth on Schedule 3.8:

(a)     The Company has timely filed all Tax Returns that it was required to file. All such Tax Returns were correct and complete in all respects and were prepared in compliance with all applicable Laws.  All Taxes owed by the Company (whether or not shown or required to be shown on any Tax Return) have been paid.  The Company is not

currently the beneficiary of any extension of time within which to file any Tax Return. No claim has ever been made by an authority in a jurisdiction where the Company does not file Tax Returns that the Company is or may be subject to taxation by that jurisdiction. There are no Liens on any of the assets of the Company that arose in connection with any failure (or alleged failure) to pay any Tax. The Company has not waived any statute of limitations in respect of Taxes nor has agreed to nor is subject to any extension of time with respect to a Tax assessment or deficiency.

(b)   There is no dispute or claim concerning any Tax Liability of the Company either (i) claimed or raised by any Government Entity or (ii) as to which the Company or the Shareholder has Knowledge. The Company has delivered to the Purchaser correct and complete copies of all income Tax Returns, examination reports, and statements of deficiencies assessed against or agreed to by the Company since December 31, 2009.

(c)   The Company is not a party to any Tax allocation or sharing agreement. The Company has no Liability for the Taxes of any Person, as a transferee or successor, by Contract, or otherwise.

(d)   The Company is and has been a validly electing S corporation within the meaning of Code Sections 1361 and 1362 for purposes of applicable federal and state income tax laws since January 1, 2009.

3.9.   Purchased Contracts.

(a)   Schedule 3.9 contains a complete and accurate list of all Material Contracts.

(b)   The Company has performed all obligations required to be performed by it to date under the Material Contracts, and there are no defaults, to the Knowledge of the Company and the Shareholder, by any other party thereto, and no event has occurred (or failed to occur) that, with the passing of time or the giving of notice or both would constitute a default by the Company under any such Material Contract, including the consummation of the transactions contemplated by this Agreement.

(c)   Except as set forth in Schedule 3.9, no consent, permission, waiver or approval is required to be obtained from, and no penalty, assessment or special payment is required to be paid to, and no notice is required to be sent to, any third party or Government Entity in order to preserve for the Purchaser the benefits of the Purchased Contracts after the consummation of the transactions contemplated by this Agreement. Except as set forth in Schedule 3.9 and with respect to the specific dollar amount set forth therein, the Company is not obligated to accept any returns from a customer and none of the Purchased Contracts are on a consignment or similar basis.

(d)   Each Material Contract is in full force and effect and constitutes a legal, valid, binding agreement, except that the enforceability thereof may be subject to or limited by bankruptcy, insolvency, reorganization, arrangement, moratorium, or other similar Laws relating to or affecting rights of creditors and general equitable principles.

- 15 -



(e)     The Purchaser has been supplied with a true and correct copy of all written Contracts required to be disclosed on the attached <u>Schedule 3.9</u> or copies of the applicable form Contracts also disclosed on the attached <u>Schedule 3.9</u> to the extent customers have executed a form Contract, together with all amendments, waivers or other changes thereto and true and correct written summaries of all oral Contracts or agreements.

3.10.   <u>Intellectual Property Rights</u>.   Set forth on <u>Schedule 3.10</u> is a list and brief description of all patents, patent rights, patent applications, trademarks, trademark applications and registrations, proprietary rights, service marks, service mark applications, trade names, domain names, and copyrights (a) owned by or registered in the name of the Company, or (b) of which the Company is a licensor or licensee or in which the Company has any right, and in each case a brief description of the nature of such right.  All of the intellectual property listed on <u>Schedule 3.10(a)</u>, and to the Knowledge of the Company and the Shareholder, all of the intellectual property listed on <u>Schedule 3.10(b)</u>, is enforceable, subsisting and valid.  The Company is not subject to any obligation, including any license or royalty obligation, relating to any product or service that the Company now markets or has marketed in the past three years. Except as set forth on <u>Schedule 3.10</u>, the Company owns all rights in, or possesses adequate licenses or other rights to use, all patents, patent applications, trademarks, trademark applications and registrations, service marks, service mark applications and registrations, indicia of origin, proprietary rights, trade names, domain names, web site content, copyrights, works of authorship, software, manufacturing processes, batch tickets, formulae, technology, trade secrets and know how, used in, or necessary to conduct, the Business as conducted prior to Closing (collectively, "<u>Intellectual Property</u>") free and clear of all Liens.  Neither the Intellectual Property nor the conduct of the Business as conducted prior to Closing, infringes or conflicts upon the right of any third party.  No claim by any third party contesting the validity, enforceability, use or ownership of the Intellectual Property by the Company has been made and to the Knowledge of the Company and Shareholder, is threatened.  To the Knowledge of the Company and the Shareholder, no third party is infringing the Intellectual Property.  The Shareholder does not own or have any interest in the Intellectual Property used by the Company. All employees and independent contractors (including consultants) that have participated in the development or creation of Intellectual Property have executed appropriate assignment agreements, pursuant to which each such employee or independent contractor has assigned to the Company all of its rights, in and to all Intellectual Property, ideas, inventions, processes, works of authorship and other work products that relate to the Business, and that were conceived, created, authored or developed, in whole or in part, by such employee or independent contractor. No past or present employee or independent contractor of the Company has any ownership interest, license, permission or other right in or to any such Intellectual Property.

3.11.   <u>Litigation</u>.   Except as set forth on <u>Schedule 3.11</u>, there are no actions, suits, proceedings (including any arbitration proceedings), orders, investigations or claims pending or, to the Knowledge of the Company and the Shareholder, threatened against the Company at law or in equity, or before or by any Government Entity.  <u>Schedule 3.11</u> lists all suits, proceedings (including any arbitration proceedings), orders, investigations or claims against the Company at law or in equity that have occurred since January 1, 2011.

- 16 -



3.12.   Brokerage and Finder's Fees.   The Company and the Shareholder have not incurred and will not incur any brokerage, finder's or similar fee in connection with the transactions contemplated by this Agreement.

3.13.   Insurance.   The Company is currently insured by insurers unaffiliated with the Company with respect to its properties, assets and operation of the Business in such amounts and against such risks that are appropriate and customary for the type of business conducted by the Company with customary deductibles and retained amounts and which insurance policies are set forth in Schedule 3.13.   In addition, the Company has maintained comparable insurance for all prior periods with respect to the Business.   With respect to each insurance policy held by the Company (a) the policy is legal, valid, binding and in full force and effect; and (b) the Company is not in default under the policy.   Except as listed in Schedule 3.13, there are no claims by the Company pending under any such policies and the Company has not been informed that coverage has been questioned, denied or disputed by the underwriters of such policies with respect to any such claims.

3.14.   Compliance with Laws; Permits.   Except as set forth on Schedule 3.14:

(a)     The Company is, and has been, in compliance with all applicable Laws.

(b)     The Company holds all permits, approvals, registrations, franchises, licenses, certificates, accreditations and other authorizations of all Government Entities (the "Permits") required for the conduct of the Business and all such Permits are set forth on Schedule 3.14.   The Company has complied with and is in compliance with the terms and conditions of such Permits.   The Company has not received any notices that it is in violation of any of the terms or conditions of such Permits.   The Company has taken all reasonable action to maintain such Permits.   No loss or expiration of any such Permit is pending to which the Company has received notice or, to the Knowledge of the Company and the Shareholder, threatened other than expiration in accordance with the terms thereof.   Except as set forth on Schedule 3.14, the Permits owned or used by the Company immediately prior to the Closing will be available for use by the Purchaser on the same terms and conditions immediately subsequent to the Closing.

(c)     Neither the Company nor its equity owners, officers, directors, employees or agents have (i) made or promised to make, directly or indirectly, any improper payment or unlawful transfer of anything of value to any government official, Government Entity, government-owned or controlled company, public international organization, political party or organization or official or candidate thereof, or any other Person; or (ii) offered, promised, accepted, or received any unlawful payments, contributions, expenditures or gifts, or anything else of value, including bribes, gratuities, kickbacks, lobbying expenditures, political contributions, and contingent fee payments.

3.15.   Related Party Transactions.   Except as set forth on Schedule 3.15, the Company has no Knowledge of and is not currently a party to any Related Party Transaction and has not been a party to any Related Party Transaction since January 1, 2011.

3.16.   Customers and Suppliers.   Schedule 3.16 sets forth a list of the top twenty-five (25) customers of the Company with respect to the Business and the top ten (10) suppliers of the

Company with respect to the Business by dollar volume of sales and purchases with respect to the Business for the fiscal years ended December 31, 2014 and December 31, 2015 and for the six-month period ended June 30, 2016. Except as set forth on Schedule 3.16, since June 30, 2015, the Company has not received any notice from any customer or supplier listed on Schedule 3.16 to the effect that any such customer or supplier will stop, materially decrease the rate of, or materially change the terms (whether related to payment, price or otherwise) with respect to, purchasing or selling products or services from or to the Company (whether as a result of the consummation of the transactions contemplated hereby or otherwise). The Company has not received notice and has no Knowledge that any customer or customers that, individually or in the aggregate, account for more than five percent (5%) of the Company's revenue has plans or has threatened to stop or materially decrease the rate of business done with the Company. The Company has not received notice and the Company has no Knowledge that any supplier or suppliers that, individually or in the aggregate, account for more than five percent (5%) of the dollar amount of payments made by the Company has plans or has threatened to stop or materially decrease the rate of business done with the Company.

3.17.  Warranties; Products.  Schedule 3.17 sets forth a description of all product or service warranties and guarantees given by the Company to any customer in connection with the Business. Each of the products developed, sold or distributed by the Company in the course of conducting the Business (the "Products") meets, and at all times has met, all standards for quality and workmanship prescribed by Law, industry standards, contractual agreements or the product literature of the Company and have been labeled in accordance with all Laws. Except as described on Schedule 3.17, (a) no claims have been made under the product or service warranties or guarantees of the Company, and (b) there have not been any mandatory or voluntary product recalls or withdrawals with respect to any Products. The Company has no Liability arising out of any injury to any Person or property as a result of the ownership, possession, or use of any products sold, leased, distributed or delivered by the Company.

3.18.  Compensation of and Contracts with Employees; Accrued Liabilities. Schedule 3.18 sets forth a correct and complete list of all employees, consultants or contractors of the Company as of the date hereof and as of the Closing Date, and sets forth for each such individual the following: (a) name, (b) title or position (including whether full or part-time), (c) hire date, (d) current annual base compensation rate, (e) commission, bonus or other incentive-based compensation, and (f) the rate and amount of such compensation paid to each such employee through June 30, 2016. Except as set forth on Schedule 3.18, there have been no changes in such compensation since January 1, 2015, in each case including bonuses and other compensation and fringe benefits. Except as listed on Schedule 3.18, the Company has no employment agreement, written or oral, with any currently active employee, including any agreement to provide any bonus or benefit to any such employee. Except as set forth on Schedule 3.18, since January 1, 2015, the Company has not made any pension, bonus or other payment, other than base salary, or become obligated to make any such payment, to any employee other than in the Ordinary Course of Business. Except as set forth on Schedule 3.18, the Company has no outstanding loans or advances to employees. Schedule 3.18 lists any employee handbook and/or personnel manuals that in any way affect such employees, correct and complete copies of which have been given to the Purchaser. Any individual performing services for the Company who has been classified as an independent contractor, as an employee of some other entity whose services are leased to the Company, or as any other nonemployee

- 18 -

category, has been correctly so classified and is in fact not a common law employee of the Company.  Except as set forth on Schedule 3.18, no employees are out on a leave of absence (whether related to disability, under the Family and Medical Leave Act, or otherwise).  The accrued paid time off of the Company's employees is set forth on Schedule 3.18.  All cash advances by the Company to its employees are as set forth on Schedule 3.18.

3.19.  Labor Relations; Employee Benefit Plans.  Except as set forth on Schedule 3.19:

(a)  The Company is not a party to any collective bargaining agreement covering any employee, and no union or association of employees has been certified or recognized as the collective bargaining representative of any employees or has attempted to engage in negotiations regarding terms and conditions of employment of such employees.  No unfair labor practice charge, work stoppage, picketing, or other such activity relating to labor matters of the Company is pending.  To the Knowledge of the Company and the Shareholder, there are no current or threatened attempts to organize or establish any labor union or employee association to represent any employees.

(b)  The Company is in compliance with all requirements of all applicable Laws governing employment and employee relations, including Laws relating to employment discrimination, civil rights, equal pay, wages, hours, collective bargaining and labor relations, occupational safety and health, workers' compensation, immigration, or the withholding and payment of income, social security (FICA) or similar taxes, and any similar Laws of any foreign jurisdiction.  No suits, charges or administrative proceedings relating to any such law or regulation will be pending as of the Closing Date.  To the Knowledge of the Company and the Shareholder, no suit, charge or administrative investigation alleging a violation of any such applicable Law has been threatened.  The Purchaser will have no Liability to any employee (or to any Government Entity with respect to any such employee) under any such Law or regulation relating to claims arising out of or related to any event occurring on or before the Closing Date.

(c)  As of the Closing Date, the Company has not engaged in any plant closing, mass layoff or other action related to any employee that has resulted or could result in Liability under the Worker Adjustment and Retraining Notification Act of 1988, or under any comparable Law or regulation of a state or a foreign jurisdiction, and has not issued any notice that any such action is to occur in the future.

(d)  The Company is in compliance with all applicable requirements of the Immigration Reform and Control Act, and has in its files properly completed copies of Form I-9 for all employees with respect to whom that form is required.

(e)  The Company has no workers' compensation Liabilities with respect to employees that are not covered by insurance or accrued for in the Most Recent Balance Sheet.

(f)  Set forth on Schedule 3.19 is a complete list of all pension, profit sharing, retirement, stock purchase, stock option, bonus, incentive compensation and deferred compensation plans, life, health, dental, accident or disability, workers' compensation or other employee welfare benefit plans (insured or self insured), educational assistance, pre

tax premium or flexible spending account plans, supplemental or executive benefit plans, non-qualified retirement plans, severance or separation plans, and any other employee benefit plans, practices, policies or arrangements of any kind, whether written or oral, which are currently maintained by the Company for the benefit of any of its employees (including former employees), or under which the Company has any current or potential Liability with respect to any employee or former employee or the dependents of any such person, including any "employee benefit plan" which is subject to the Employee Retirement Income Security Act of 1974, as amended ("ERISA") (herein collectively referred to as "Employee Benefit Plans" and individually as an "Employee Benefit Plan"). All Employee Benefit Plans comply in form and in operation in all respects with their terms, the applicable requirements of ERISA, the applicable requirements of the Code and all applicable Laws. The Purchaser will not have any Liability (whether actual, potential or contingent) on or after the Closing Date with respect to any Employee Benefit Plan.

(g)     With respect to each Employee Benefit Plan, the Company has delivered to the Purchaser accurate, current and complete copies of each of the following: (i) where the Employee Benefit Plan has been reduced to writing, the plan document, together with all amendments; (ii) where the Employee Benefit Plan has not been reduced to writing, a written summary of all material plan terms; (iii) where applicable, copies of any trust agreements, custodial agreements, insurance policies, administration agreements and similar agreements, and investment management or investment advisory agreements; (iv) copies of any summary plan descriptions, employee handbooks or similar employee communications relating to any Employee Benefit Plan; (v) in the case of any Employee Benefit Plan that is intended to be qualified under Section 401(a) of the Code, a copy of the most recent determination letter from the Internal Revenue Service; (vi) in the case of any Employee Benefit Plan for which Forms 5500 are required to be filed, a copy of the most recently filed Forms 5500, with schedules attached; and (vii) copies of notices, letters or other correspondence from the Internal Revenue Service, Department of Labor or Pension Benefit Guaranty Corporation relating to the Employee Benefit Plan.

3.20.   Real Property.Except as set forth on Schedule 3.20(a), the Company owns marketable fee simple title to the Owned Real Property free and clear of all Liens.

(b)     The Real Property Leases are in full force and effect. There are currently no defaults under the Real Property Leases and no event has occurred and no condition exists, which, with the giving of notice or the passage of time, or both, will constitute a default under the Real Property Leases.

(c)     The Real Property constitutes all of the real property used by the Company in connection with the operation of the Business.

(d)     The Company has not received notice that there are any pending or, to the Knowledge of the Company, threatened, condemnation or other proceedings relating to the Real Property or other matters adversely affecting the use or occupancy of the Real Property.

- 20 -

(e)     The Company has received all requisite approvals of Government Entities (including Permits) required to be obtained by Company in connection with the Company's occupancy of the Real Property and operation of the Business, and the Company has not received notice that the Real Property has not been operated and maintained in accordance with applicable Laws.

(f)     Except as set forth on Schedule 3.20(f), the Company not entered into any leases, subleases, licenses, concessions, or other agreements, written or oral, granting to any party the right of use or occupancy of any portion of the Real Property.  There are no third parties in possession of the Real Property except as set forth in Schedule 3.20(f).

(g)     Except as set forth on Schedule 3.20(g), there are no Contracts affecting the Real Property that will survive Closing.

(h)     The Company has not received notice of actual or threatened reduction or curtailment of any utility service now supplied to the Real Property.

(i)     The Real Property has legal and practical access to a public right of way.

(j)     The Buildings are in good operating condition, including but not limited to the roof, foundation and Buildings' systems.

(k)     The Company is not in default concerning any of its obligations or liabilities regarding the Real Property.

(l)     The Company is not a "foreign person", "foreign partnership", "foreign trust" or "foreign estate" as those terms are defined in Section 1445 of the Internal Revenue Code.

(m)     The Real Property is usable for its current uses without violating any federal, state, local or other governmental building, zoning, health, safety, platting, subdivision or other law, ordinance or regulation, or any applicable private restriction, and such use is a legal conforming use.

(n)     There are no wells or private sewage treatment systems in, on, or about the Real Property.

(o)     The Real Property is sufficient for the operation of the Company as it is currently operated.

3.21.     Indebtedness and Guarantees.   Schedule 3.21 lists all Indebtedness of the Company and the outstanding balance thereof as of the Closing Date and all obligations of others guaranteed by the Company, which includes amounts for assets under capital leases (as determined in accordance with GAAP whether or not properly reported on the Financial Statements).  The Company is not in default of its obligations under its Indebtedness.

3.22.     Environmental Matters.  Except as disclosed on Schedule 3.22:



(a)     The operations of the Company are and have been in compliance with all Environmental Laws.

(b)     The Company has not received any notice from a Person alleging that the Company, the Business or any Owned Real Property or Leased Real Property is not in compliance with applicable Environmental Laws.

(c)     The Company has obtained and is in compliance with all Permits that are required pursuant to Environmental Laws for the occupation of its Owned Real Property and Leased Real Property and the operation of the Business, and all such Permits are identified on Schedule 3.14.  The Company has undertaken, or will undertake prior to the Closing Date, all measures necessary to facilitate transferability of such Permits, and Seller is not aware of any condition, event or circumstance that might prevent or impede the transferability of the same.

(d)     The Company has not received any order, notice, or other communication from (nor to the Knowledge of the Company has any action been threatened by) any Person of any alleged obligation to undertake or bear the cost of any Remediation Action.

(e)     There are no pending or, to the Knowledge of the Company threatened, claims, Liens, or other restrictions of any nature, resulting from any violation or failure to comply with any applicable Environmental Law, with respect to or affecting any of the Owned Real Property or Leased Real Property currently utilized by the Company.

(f)     There has been no Release of any Hazardous Substances on or from any real property owned, operated or leased by the Company that would be in violation of any applicable Environmental Law or that have or would be expected to result in liability under applicable Environmental Law.

(g)     The Company's operations have not caused to occur or exist any Hazardous Substances present on or in the Owned Real Property or Leased Real Property, including any Hazardous Substances contained in barrels, above or underground storage tanks, landfills, land deposits, dumps, equipment (whether moveable or fixed) or other containers, either temporary or permanent, and deposited or located in land, water, sumps, or any other part of the Owned Real Property or Leased Real Property in violation of any applicable Environmental Laws or that have or would be expected to result in liability under applicable Environmental Law.

(h)     The Company has not sent or disposed of Hazardous Substances to or at a site which, pursuant to the Comprehensive Environmental Response, Compensation, and Liability Act (42 U.S.C. § 9601 et seq.), or any similar state law, has been listed or proposed for listing on the "National Priorities List" or its state equivalent.

(i)     The Company has delivered to the Purchaser true and complete copies of all environmental studies, investigation reports, Permits, audits, site assessments, risk assessments, and other similar documents with respect to the Owned Real Property, the Leased Real Property and the Business that are within the Company's possession or reasonable control.

- 22 -



(j)     The Company has not installed at the Owned Real Property or Leased Real Property, and there has not existed at the Owned Real Property or Leased Real Property, (i) any underground storage tanks (ii) dikes or impoundments containing Hazardous Substances, (iii) any friable asbestos containing building materials or (iv) any polychlorinated biphenyls.

3.23.   <u>Disclosure</u>.  No representation or warranty by the Company or the Shareholder contained in this Agreement, and no statement contained in the Schedules or any other document, certificate or other instrument delivered to or to be delivered by or on behalf of the Company pursuant to this Agreement, contains or will contain any untrue statement of a material fact or omits or will omit to state any material fact necessary, in light of the circumstances under which it was or will be made, in order to make the statements herein or therein not misleading.

## ARTICLE IV
### Representations and Warranties of the Purchaser

As a material inducement to the Company and the Shareholder to enter into this Agreement and consummate the transactions contemplated hereby, the Purchaser hereby represents and warrants to the Company as follows:

4.1.   <u>Organization</u>.  The Purchaser is a limited liability company duly organized, validly existing and in good standing under the Laws of Delaware.  The Purchaser possesses all requisite limited liability company power and authority to own, lease and operate its properties and to carry on its business as it is now being conducted.

4.2.   <u>Power and Authority; Enforceability</u>.  The Purchaser has all requisite limited liability company power and authority to enter into and consummate the transactions contemplated by this Agreement and the Transaction Documents to which it is a party.  The execution and delivery by the Purchaser of the Transaction Documents to which it is a party and the consummation of the transactions contemplated thereby have been duly authorized by all necessary action on the part of the Purchaser.  This Agreement has been duly executed and delivered by the Purchaser and each of the other Transaction Documents to which it is a party have been duly executed and delivered by the Purchaser and this Agreement does, and such Transaction Documents do, constitute the legal, valid and binding obligations of the Purchaser, enforceable against the Purchaser in accordance with their respective terms, except to the extent that (a) their enforceability may be limited by applicable bankruptcy, insolvency, reorganization or other Laws affecting the enforcement of creditor's rights generally, and (b) the availability of equitable remedies is subject to the discretion of the court before which any such proceeding may be brought.

4.3.   <u>No Conflicts</u>.  Neither the execution and delivery of this Agreement by the Purchaser or of any Transaction Documents to which it is a party nor the consummation by the Purchaser of the transactions contemplated by this Agreement or such Transaction Documents will (a) conflict with or violate any provision of the Organizational Documents of the Purchaser, (b) violate or conflict with any Law, rule, regulation, writ, judgment, injunction, decree, determination, award or other order of any court, government or governmental agency or instrumentality, domestic or foreign, that is applicable to the Purchaser; or (c) require any authorization, consent, approval, order, exemption or other action by or notice to any court, other Government Entity or other Person or entity under, the provisions of any applicable Law, judgment, order or decree, except as has been obtained in advance of the Closing Date.

- 23 -

**ARTICLE V**
**Indemnification**

5.1.    <u>Indemnification by the Company, the Shareholder and the Joinder Parties; R&W Insurance Policy</u>.  The Company, the Shareholder and the Joinder Parties will jointly and severally, indemnify, defend, and hold harmless the Purchaser and each of its officers, managers, directors, employees, members, shareholders, Affiliates, representatives and successors and assigns (collectively, the "<u>Purchaser Indemnified Parties</u>") from, against and with respect to, and will compensate and reimburse the Purchaser and the Purchaser Indemnified Parties for, any and all losses, Liabilities, fees, damages (including consequential and incidental damages, lost profits, and punitive damages but only to the extent such punitive damages are actually awarded to a third party), and costs and expenses (including, without limitation, reasonable attorney's and accountant's fees and costs and expenses reasonably incurred in investigating, preparing, defending against, or prosecuting any litigation or claim, action, suit, proceeding, or demand) (collectively, "<u>Damages</u>"), of any kind or character, regardless of whether or not such Damages relate to any third party claim, arising out of or in any manner incident, relating or attributable to (a) any inaccuracy in any representation or warranty of the Company and the Shareholder contained in this Agreement or in any certificate delivered in connection with this Agreement, (b) any failure by the Company, the Shareholder or the Joinder Parties to perform or observe, or to have performed or observed, in full, any covenant, agreement, or condition to be performed or observed by it under this Agreement or under any certificate or other document or agreement executed by the Company, the Shareholder or the Joinder Parties in connection with this Agreement, (c) the Excluded Liabilities, (d) the operation of the Business or the ownership of the Assets on or prior to the Closing Date, (e) any Taxes with respect to operation of the Business by the Company, (f) any Outstanding Transaction Expenses of the Company, the Shareholder or the Joinder Parties, (g) any unpaid Indebtedness of the Company, or (h) any specific items that are identified by the Purchaser to the Company in writing prior to Closing as a result of its diligence of the Business and set forth on <u>Schedule 5.1</u>.  Contemporaneously with Closing, Purchaser, at the Company's and the Shareholder's sole expense, obtained an insurance policy for certain breaches or inaccuracies of the Company's and the Shareholder's representations and warranties set forth in <u>Article III</u> above (the "<u>R&W Insurance Policy</u>").

5.2.    <u>Limitations</u>.

(a)    Any claim for indemnification pursuant to <u>Section 5.1(a)</u> (other than claims relating to Fundamental Reps) must be made on or prior to the twelve (12) month anniversary of the Closing Date.

(b)    Claims asserted by the Purchaser related to or arising out of inaccuracies or breach in any representation or warranty in (i) <u>Sections 3.1</u> (Organization and Qualification; Capitalization), <u>3.2</u> (Power and Authority; Enforceability), <u>3.7</u> (Title to Assets; Sufficiency), <u>3.12</u> (Brokerage and Finder's Fees), and <u>3.21</u> (Indebtedness and Guarantees) will survive indefinitely and (ii) <u>Sections 3.8</u> (Tax Matters), <u>3.10</u> (Intellectual Property Rights) and <u>3.22</u> (Environmental Matters) will survive for the applicable statute of limitations plus sixty (60) days (collectively the Sections referenced in (i) and (ii) above, the "<u>Fundamental Reps</u>").  In addition, if notice of a violation or breach of any specified representation or warranty is given to the party charged with such violation or breach during the period provided for in <u>Sections 5.2(a)</u> or <u>5.2(b)</u>, such

- 24 -

representation or warranty will continue to survive until such matter has been resolved by settlement, litigation (including all appeals related thereto) or otherwise. All covenants and agreements that by their terms contemplate performance after the Closing Date will survive the Closing indefinitely, unless specified otherwise by their terms.

(c)     Notwithstanding the foregoing, the Company, the Shareholder and the Joinder Parties will not be obligated to indemnify and hold the Purchaser harmless for a claim pursuant to Section 5.1(a) for such Damages unless and until the aggregate amount of such Damages exceeds Ninety-Five Thousand Dollars ($95,000) (the "Basket"), and then the Company, the Shareholder and the Joinder Parties will be liable to the Purchaser for all such Damages (expressly not taking into account the Basket), but subject to the Cap (as hereinafter defined). The maximum aggregate liability of the Company, the Shareholder and the Joinder Parties for all claims made by the Purchaser pursuant to Section 5.1(a) will not exceed an amount equal to Four Million Seven Hundred Fifty Thousand Dollars ($4,750,000) (the "Cap"). Notwithstanding the foregoing, the limitations set forth in this Section 5.2(c) do not apply to Damages related to or arising out of any claims asserted by the Purchaser for breaches of Fundamental Reps or claims brought pursuant to Sections other than Section 5.1(a).

(d)     Notwithstanding anything contained in this Agreement to the contrary, no limitations on liability set forth in this Article V will apply with respect to claims based on fraud or intentional misrepresentation.

(e)     Notwithstanding anything to the contrary herein, for the purposes of determining the existence of any breach of a representation, warranty, covenant or agreement made by the Company, the Shareholder or the Joinder Parties and for the purposes of determining Damages, each representation, warranty, covenant and agreement made by the Company, the Shareholder and the Joinder Parties will be deemed made without any qualifications or limitations as to materiality and, without limiting the foregoing, the word "material" and words of similar import will be deemed deleted from any such representation, warranty, covenant or agreement.

(f)     The Purchaser will have the right to offset any indemnifiable Damages against the (i) Escrow Amount, and (ii) any other payment due to the Company, the Shareholder or the Joinder Parties, in each case on a dollar-for-dollar basis.

(g)     Notwithstanding anything to the contrary herein, (i) Damages will be limited to the amount of any Damages that remain after deducting therefrom any insurance proceeds actually received by the Indemnitee in respect of such claim (including, without limitation, amounts received under the R&W Insurance Policy), less any related costs and expenses, including the aggregate cost of pursuing any related insurance claims and the present value of any related increases in insurance premiums or other chargebacks, related to such Damage, and (ii) to the extent the Indemnitee recovers any Damages from the Indemnitor and such Damages are actually recovered by the Indemnitee from the insurer under the R&W Insurance Policy or other insurance (subject to the reductions set forth above) (the "Recovered Amount"), the Indemnitee will, to avoid duplicative recovery, reimburse to the Indemnitor an amount equal to the lesser of (A) the amount of such Damages collected from the Indemnitor and (B) the Recovered

- 25 -

Amount.  To the extent that that the R&W Insurance Policy would likely cover Purchaser's Damages related to breaches or inaccuracies of the Company's and the Shareholder's representations and warranties set forth in Article III, the Purchaser will use commercially reasonable efforts to recover such Damages under the R&W Insurance Policy prior to seeking indemnification under this Agreement: provided, however, that in no event will the Purchaser be required to commence any litigation in connection with its attempt to recover Damages under the R&W Insurance Policy.

5.3.   Indemnification by the Purchaser.  The Purchaser will indemnify, defend, and hold harmless the Company and the Shareholder from, against and with respect to, and will compensate and reimburse the Company and the Shareholder for, any Damages, of any kind or character, regardless of whether or not such Damages relate to any third party claim, arising out of or in any manner incident, relating or attributable to (a) any inaccuracy in any representation or warranty of the Purchaser contained in this Agreement, (b) any failure by the Purchaser to perform or observe, or to have performed or observed, in full any covenant, agreement, or condition to be performed or observed by it under this Agreement or under any certificate or other document or agreement executed by the Purchaser in connection with this Agreement, and (c) any Assumed Liability, in each case, other than to the extent the claim otherwise relates to the Company's, the Shareholder's or a Joinder Party's breach of a representation, warranty, or covenant.  Any claim for indemnification pursuant to subsection (a) above must be made on or prior to the twelve (12) month anniversary of the Closing Date.  Notwithstanding the above, any claim for indemnification under subsection (a) above made in accordance with this Article V prior to the expiration of the applicable indemnification period will survive until such matter is resolved.  All covenants and agreements which by their terms contemplate performance after the Closing Date will survive Closing indefinitely, unless specified otherwise by their terms.

5.4.   Notice and Right to Defend.  Promptly after becoming aware of a claim as to which indemnity may be sought pursuant to this Article V, the party seeking indemnification (the "Indemnitee") will notify the other party (the "Indemnitor") of such claim.  The Indemnitee's failure or delay in providing the notice will not relieve the Indemnitor of its obligations under this Article V except to the extent that the Indemnitor is materially prejudiced as a result thereof.  Unless the Indemnitor notifies the Indemnitee that the Indemnitor elects to assume the defense or the settlement of such claim (such notice to be given as promptly as reasonably possible in view of the necessity to arrange such defense and in no event later than ten (10) days following the notice to the Indemnitor), the Indemnitee will have the exclusive right to defend, settle, or pay such claim.  If the Indemnitor assumes the defense of a third-party claim, such assumption will conclusively establish for purposes of this Agreement that the claims made in the third-party claim are within the scope of and subject to indemnification.  The Indemnitee will not be liable to the Indemnitor for any legal or other expense incurred by the Indemnitor in connection with any such defense or settlement undertaken by the Indemnitor.  If the Indemnitor assumes the defense, the Indemnitor will not agree to any settlement, compromise or discharge of a third-party claim without the Indemnitee's prior written consent (not to be unreasonably withheld).  If the Indemnitor has assumed the defense or settlement of such claim, the Indemnitee will have the right to employ its own counsel, at its own expense.  If, in good faith, the Indemnitee concludes that there are specific defenses available to it that are different from or additional to those available to the Indemnitor, that such claim may have a material adverse effect upon the Indemnitee with respect to matters beyond the scope of the indemnities under this Article V, a

- 26 -

court of competent jurisdiction rules that the Indemnitor has failed or is failing to prosecute or defend such claim, the claim relates to Taxes, criminal or regulatory action, or the claim seeks damages other than monetary damages, the Indemnitee will have the right to direct the defense of any such claim at the expense of the Indemnitor (but subject to the limitations in this Article V). The defending party in any event will (a) settle or defend such claim with reasonable diligence, (b) cooperate with the other parties in the investigation and analysis of such claim or proceeding, (c) afford the other parties reasonable access to such relevant information as it may have in its possession, and (d) keep the other parties reasonably informed regarding such claim and any related proceedings.

## ARTICLE VI
### Covenants

6.1.    General.  In case at any time after the Closing any further action is necessary to carry out the purposes of this Agreement, each of the parties will take such further action (including the execution and delivery of such further instruments and documents) as any other party reasonably may request, all at the sole cost and expense of the requesting party.  From and after the Closing, the Company will provide the Purchaser with reasonable access to all of the Company's documents, books, records (including tax records), agreements, and financial data of any sort relating to the Assets.

6.2.    Confidentiality.  The Company, the Shareholder and the Joinder Parties will treat and hold as such all of the Confidential Information, refrain from using any of the Confidential Information except in connection with this Agreement, and deliver promptly to the Purchaser or destroy, at the request and option of the Purchaser, all tangible embodiments (and all copies) of the Confidential Information that are in such party's possession and included in the Assets.  In the event that either the Company, the Shareholder or any Joinder Party is requested or required (by oral question or request for information or documents in any legal proceeding, interrogatory, subpoena, civil investigative demand, or similar process) to disclose any Confidential Information, the Company, the Shareholder or the Joinder Party will notify the Purchaser promptly of the request or requirement so that the Purchaser may seek an appropriate protective order or waive compliance with the provisions of this Section 6.2.  If such protective order is not obtained, or if and to the extent Purchaser waives such prohibition, the Company, the Shareholder or the Joinder Party may make such disclosure.  Notwithstanding anything herein to the contrary, each party to this Agreement (and each employee, representative, and other agent of such party) may disclose to any and all Persons, without limitation, the Agreement and the transactions contemplated hereby for Tax reporting, legal advice and other similar purposes.

6.3.    Non-Competition by the Company, the Shareholder and the Joinder Parties.For a period of three (3) years immediately following the Closing Date, the Company, the Shareholder and the Joinder Parties will not, directly or indirectly, anywhere in the world (i) engage in any business or activity that competes with the business of supplying lubricants and tank wagon fuel to any third parties or (ii) invest in, own, manage, operate, finance, control, advise, render services to or guarantee the obligations of any Person engaged in or planning to become engaged in any business or activity that competes with the business of supplying lubricants and tank wagon fuel to third parties or any business engaged in by the Purchaser or its Affiliates, provided, however, that notwithstanding the foregoing, (i) the Company, the Shareholder and the Joinder Parties may (A) market,

sale, deliver and distribute mobile fleet fueling to third parties, and (B) purchase or otherwise acquire up to (but not more than) three percent (3%) of any class of the securities of any Person (but may not otherwise participate in the activities of such Person) if such securities are listed on any national or regional securities exchange or have been registered under Section 12(g) of the Securities Exchange Act of 1934, as amended; and (ii) the Shareholder may (A) market, sale, deliver and distribute fuels to marketers, fuel stations, truck stops, fleets, refineries and bio-plants and other third parties; and (B) own and manage fuel terminals.

(b) <u>Nonsolicitation and Nonhire</u>. For a period of five (5) years immediately following the Closing Date, the Company, the Shareholder and the Joinder Parties will not, directly or indirectly:

(i) solicit the business of any Person who is a customer of the Purchaser or its Affiliates with respect to the Business;

(ii) cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of the Purchaser or its Affiliates to cease doing business with such parties, to deal with any competitor of the Purchaser or its Affiliates, or in any way interfere with its relationship with such parties;

(iii) cause, induce or attempt to cause or induce any customer, supplier, licensee, licensor, franchisee, employee, consultant or other business relation of the Company on the Closing Date or within the year preceding the Closing Date to cease doing business with the Purchaser or its Affiliates, to deal with any competitor of the Purchaser or its Affiliates, or in any way interfere with its relationship with such parties with respect to the Business; or

(iv) hire, retain or attempt to hire or retain any employee or independent contractor of the Purchaser or its Affiliates (including any former employee or independent contractor if such Person was an employee or independent contractor of the Purchaser or any of its Affiliates within the twelve (12) month period prior to such hiring, retention or attempt to hire or retain) or in any way interfere with the relationship between the Purchaser or any of its Affiliates and any of their respective employees or independent contractors.

(c) <u>Tolling</u>. If the Company, the Shareholder or any Joinder Party violates any provisions or covenants of this <u>Section 6.3</u>, the duration of the restrictions in this <u>Section 6.3</u> will be extended for a period of time equal to that period beginning when such violation commenced and ending when the activities constituting such violation terminated, and, in the event the Purchaser seeks relief from such violation before any court, board or other tribunal, then the duration of restrictions in this <u>Section 6.3</u> will be extended for a period of time equal to the pendency of such proceedings, including all appeals.

(d) <u>Modification of Covenant</u>. If a final judgment of a court or tribunal of competent jurisdiction determines that any term or provision contained in <u>Section 6.3</u> is

- 28 -



invalid or unenforceable, then the parties agree that the court or tribunal will have the power to reduce the scope, duration or geographic area of the term or provision, to delete specific words or phrases or to replace any invalid or unenforceable term or provision with a term or provision that is valid and enforceable and that comes closest to expressing the intention of the invalid or unenforceable term or provision. This Section 6.3 will be enforceable as so modified after the expiration of the time within which the judgment may be appealed. The Company, the Shareholder and the Joinder Parties acknowledge this Section 6.3 is reasonable and necessary to protect and preserve the Purchaser's and its Affiliates' legitimate business interests. The Company, the Shareholder and the Joinder Parties also acknowledge that the Business and the business engaged in by the Purchaser and its Affiliates has a worldwide geographic scope.

(e)  Enforcement of Covenant. The parties agree that the remedy of damages at law for the breach of any of the covenants contained in this Section 6.3 is an inadequate remedy and that the Company, the Shareholder and the Joinder Parties will not challenge the enforceability or reasonableness of the covenants set forth in this Section 6.3. In recognition of the irreparable harm that a violation by the Company, the Shareholder or the Joinder Parties of any of the covenants, agreements or obligations arising under this Section 6.3 would cause the Purchaser or its Affiliates, the Company, the Shareholder and the Joinder Parties agree that in addition to any other remedies or relief afforded by law, an injunction against an actual or threatened violation or violations may be issued against the Company, the Shareholder or any Joinder Party without posting a bond or other security. In the event of an action to enforce the covenants in this Section 6.3, the Purchaser will be entitled to be reimbursed for attorney's fees incurred by the Purchaser with respect to such action. The Company, the Shareholder and the Joinder Parties acknowledge and expressly consent to the governing law and exclusive jurisdiction provisions set forth in Section 9.8 with respect to this Section 6.3.

6.4.  Transfer Taxes and Other Closing Costs. The Company will be responsible for all stamp, transfer, documentary, sales, use, value added, registration, property, excise and other such taxes and fees relating thereto (including any penalties, interest and additions to such taxes) incurred in connection with this Agreement, all other agreements or instruments contemplated herein and the transactions contemplated hereby, and the Company will make all filings, returns, reports and forms as may be required to comply with the provisions of all applicable tax laws. The Company will pay, on or before the Closing Date, all special assessments levied, pending or constituting a lien against the Owned Real Property as of the Closing Date including without limitation any installments of special assessments (including interest payable thereon) which are certified for payment with the real estate taxes in the year of the Closing. Real estate taxes due and payable in the year of the Closing will be prorated between the Company and Purchaser as of the Closing Date based upon a calendar year. Real estate taxes due and payable in all prior years will be paid by the Company. The Company will pay all deferred real estate taxes or special assessments that may become payable as a result of the sale contemplated hereby. The Company and the Purchaser will each pay one half of any reasonable and customary closing fee or charge imposed by any closing agent designated by the Title Company. The Company will pay the cost of recording all documents necessary to place record title in the condition warranted and required of the Company in this Agreement. Purchaser will pay the cost of recording the

- 29 -



warranty deeds and any mortgages and related documents which the Purchaser grants on the Real Property in connection with the transaction contemplated by this Agreement.

      6.5.   Payment of Excluded Liabilities. The Company will pay, or make adequate provision for the payment, in full (or such reduced amount as is mutually agreed upon by the vendor and the Company) all of the Excluded Liabilities of the Company. If any such Excluded Liabilities are not so paid or provided for, or if the Purchaser reasonably determines that failure to make any payments will impair the Purchaser's use or enjoyment of the Assets or conduct of the Business as previously conducted by the Company with the Assets, the Purchaser may, at any time after the Closing Date, elect to make all such payments directly (but will have no obligation to do so) and will be promptly reimbursed by the Company and the Shareholder, jointly and severally, for the amount paid by the Purchaser (or at the Purchaser's election, the Purchaser may offset such amount against the Escrow Amount).

      6.6.   Post-Closing Reconciliation of Accounts. Subject to Section 1.7(c)(v) above, the Shareholder and the Company will cause any payments received by the Company after the Closing Date with respect to Accounts Receivable (or any other Assets) to be delivered to the Purchaser within three (3) days of receipt.

      6.7.   Name Change. The Company will adopt, as of the Closing Date, a new entity name wholly dissimilar to its current name and any variations or derivations thereof, and will within three (3) days following the Closing file necessary amendments to its Organizational Documents to reflect such name change. After the Closing, the Company and the Shareholder will not use the Company's name or any variation or derivation thereof in any commercial context.

      6.8.   Employees. Effective immediately after the Closing, the Purchaser may offer to certain employees of the Company ("Former Company Employees") employment as employees of the Purchaser. In no event will the Purchaser be liable or responsible for paying or providing to any employee or former employee of the Company any severance benefits, accrued vacation or other payments required to be paid to Company's employees or former employees in connection with termination of employment. On or prior to the Closing Date, the Company will make all payments to the Former Company Employees required under any federal, state or local wage and hour Law, including the payment of accrued wages, paid time off, bonuses and commissions. If the Company takes any action that could be construed as a "plant closing" or "mass layoff", or that results in any employee retained or employed by the Company suffering or deeming to have suffered any "employment loss", as those terms are defined in the Worker Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101-2109 and any equivalent state law (the "WARN Act"), the Company will be solely responsible for providing any notice required by the WARN Act and for making payments, if any, which may be required under the WARN Act for failure to provide appropriate notice.

      6.9.   Pre-Closing Conduct of Business. Except (a) with the prior written consent of the Purchaser, which consent may be withheld in its sole discretion, (b) as required by applicable Laws or (c) as otherwise explicitly contemplated herein, during the period from the date hereof to the Closing Date, the Company will, and the Shareholder will cause the Company to, continue to conduct the Business in the Ordinary Course of Business.

- 30 -

6.10.    Exclusivity.  From the date of this Agreement until the earlier of the Closing Date or the date this Agreement is terminated, neither the Company, the Shareholder, nor the Joinder Parties, nor any of their respective directors, managers, officers, equityholders, representatives, agents or Affiliates will, directly or indirectly, solicit, initiate, encourage, respond favorably to, permit or condone inquiries or proposals from, or provide any confidential information to, or participate in any discussions or negotiations with, any Person (other than the Purchaser, its Affiliates and their respective directors, managers, officers, employees, representatives and agents) concerning (a) any direct or indirect merger, sale of all or substantially all of the assets of the Business, acquisition, business combination, change of control or other similar transaction involving the Business, or (b) any direct or indirect purchase or other acquisition by any Person of all or any portion of the Assets or any equity interest of the Shareholder other than inventory in the Ordinary Course of Business.  From the date of this Agreement until the earlier of the Closing Date or the date this Agreement is terminated, the Company will promptly advise the Purchaser of, and communicate to the Purchaser the terms and conditions of (and the identity of the Person making), any such inquiry or proposal received.

6.11.    Pre-Closing Access; Financial Information.  From the date of this Agreement until the earlier of the Closing Date or the date this Agreement is terminated, the Company and the Shareholder will give the Purchaser and the Purchaser's representatives, upon reasonable notice and the consent (such consent not to be unreasonably withheld, conditioned or delayed) of the Company's management team, reasonable access during normal business hours to the Company's facilities and information related to the Business, and will make themselves available to the Purchaser and its representatives as the Purchaser and its representatives may from time to time reasonably request.  From the date of this Agreement until the earlier of the Closing Date or the date this Agreement is terminated, the Company will provide the Purchaser with monthly and year to date financial information within ten (10) days following the end of each calendar month.

6.12.    Schedule and Exhibits.

(a)    The parties acknowledge that the Company has not delivered to the Purchaser any of the Schedules or Exhibits to this Agreement prior to the parties' execution of this Agreement.  The Company agrees to deliver the Purchaser with all of the Schedules referenced in Sections 1.1, 1.2 1.3 and Article III to this Agreement (collectively, the "Company Schedules") promptly following the date hereof.  In the event that either (a) the Company does not promptly deliver the Company Schedules to the Purchaser or (b) the Purchaser, in its sole discretion, does not agree to or is not satisfied, in its sole discretion, with the contents and/or the terms and conditions contained in such Schedules, then the Purchaser may terminate this Agreement by written notice to the Company.

(b)    Other than the Company Schedules, the parties will negotiate in good faith to prepare and finalize the Schedules and Exhibits to this Agreement prior to the Closing.  In the event that the parties cannot reach agreement on the contents and/or the terms and conditions contained in such Schedules and Exhibits, then the Purchaser may terminate this Agreement by written notice to the Company.



# ARTICLE VII
## Termination

7.1.    Termination.  This Agreement may be terminated at any time on or prior to the Closing Date:

(a)    with the mutual written consent of the Purchaser and the Company; or

(b)    by the Purchaser by notice to the Company:

(i) in accordance with Section 6.12, or (ii) if the Company, the Shareholder, or the Joinder Parties breached or failed to perform any of their respective representations, warranties, covenants or other agreements contained in this Agreement, which breach or failure to perform (A) would give rise to the failure of any of the conditions set forth in Section 2.1 to be satisfied and (B) has not been or is incapable of being cured by the Company, the Shareholder or the Joinder Parties, as applicable, within thirty (30) days after his receipt of written notice thereof from the Purchaser;

(ii) any of the conditions set forth in Section 2.1 shall not have been, or if it becomes apparent in the sole determination of the Purchaser that any of such conditions will not be, fulfilled by the later of (A) September 30, 2016 or (B) thirty (30) days after the Purchaser receives title commitments on the Owned Real Property, each in a form and substance acceptable to the Purchaser in its sole discretion, unless such failure shall be due to the failure of the Purchaser to perform or comply with any of the covenants, agreements or conditions hereof to be performed or complied with by it prior to the Closing;

(iii) in the event that the Purchaser is unsatisfied with the results of its due diligence investigations; or

(iv) in the event that the Purchaser is unable to secure the necessary financing or obtain such consents and approvals from its lenders and financial partners as may be required.

7.2.    Effect of Termination.  If this Agreement is terminated pursuant to Section 7.1, this Agreement will become void and of no effect with no liability on the part of any party except that termination will not relieve any party of any liability or damages resulting from any breach by that party of this Agreement.

# ARTICLE VIII
## Definitions

For the purposes hereof, the following terms have the meanings set forth below:

"Affiliate" of any particular Person means any other Person controlling, controlled by or under common control with such particular Person, where "control" means the possession,



directly or indirectly, of the power to direct the management and policies of a Person whether through the ownership of voting securities, Contract or otherwise.

"Cash" means cash and cash equivalents (excluding any cash required to cover checks or other similar payments that have been made by the Company but have not yet cleared).

"Code" means the Internal Revenue Code of 1986, as amended.

"Confidential Information" means information regarding the terms of and transactions contemplated under this Agreement and the other Transaction Documents, and any information with respect to the Business that the Company has treated as proprietary and that it does not in the Ordinary Course of Business disclose to any Person outside the Company concerning the businesses and affairs of the Company, excluding any information that (a) is in the public domain at the time of disclosure, (b) is published or otherwise comes into the public domain after its disclosure through no violation of this Agreement, (c) is disclosed to the recipient by a third party not under an obligation of confidence, or (d) is already known by the recipient at the time of its disclosure as evidenced by written documentation of the recipient existing prior to such disclosure.

"Contracts" means all oral or written contracts, agreements, instruments and other documents to which a Person is a party or by which it or its assets is or are bound.

"Current Assets" means all current operating assets of the Company set forth on Exhibit A hereto to the extent not included in the Excluded Assets, based upon the books and records of the Company and prepared on a consistent basis in accordance with GAAP, consistently applied, provided, however, that the accounts receivable included in Current Assets shall be reflected at their gross amount and shall not be reduced by any allowance for bad or uncollectible receivables; provided, further that (a) any damaged, unsaleable or obsolete inventory included in the Current Assets will be valued at $0, and (b) all inventory of the Company not included in the Excluded Assets will be valued at the following percentage of its actual costs based on the turnover time of such inventory in the fiscal year immediately preceding the Closing Date:

| Inventory Turnover Times in Preceding Year | Inventory Value |
| --- | --- |
| 0 to 0.300 times per year | 0% of such inventory's actual cost |
| 0.301 to 0.600 times per year | 30% of such inventory's actual cost |
| 0.601 to 0.900 times per year | 60% of such inventory's actual cost |
| 0.901 to 0.999 times per year | 90% of such inventory's actual cost |
| 1.00 or more times per year | 100% of such inventory's actual cost |

"Current Liabilities" means all current operating liabilities of the Company set forth on Exhibit A hereto, in each case, as of the Closing Date and based upon the books and records of the Company and prepared in accordance with GAAP, consistently applied.

"Environmental Laws" means any applicable Law, order or binding agreement with any Governmental Entity: (a) relating to pollution (or the cleanup thereof) or the protection of natural resources, endangered or threatened species, human health or safety, or the environment (including ambient air, soil, surface water or groundwater, or subsurface strata); or (b) concerning the presence of, exposure to, or the management, manufacture, use, containment, storage, recycling, reclamation, reuse, treatment, generation, discharge, transportation, processing, production, disposal or remediation of any Hazardous Substances.

"Escrow Agent" means JPMorgan Chase Bank, N.A.

"GAAP" means United States generally accepted accounting principles consistently applied, as in effect when applied.

"Government Entity" means individually, and "Government Entities" means collectively, any federal, state or local or foreign government, any political subdivision thereof or any court, administrative or regulatory agency, department, instrumentality, body or commission or other governmental authority or agency, domestic or foreign.

"Hazardous Substances" means: (a) any material, substance, chemical, waste, product, derivative, compound, mixture, solid, liquid, mineral or gas, in each case, whether naturally occurring or manmade, that is hazardous, acutely hazardous, toxic, or words of similar import or regulatory effect under Environmental Laws; and (b) any petroleum or petroleum-derived products, radon, radioactive materials or wastes, asbestos in any form, lead or lead-containing materials, urea formaldehyde foam insulation or polychlorinated biphenyls.

"Indebtedness" means, with respect to any Person at any date, without duplication: (a) all obligations of such Person for borrowed money or in respect of loans or advances; (b) all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments (including, without limitation, any seller notes issued in connection with any acquisition undertaken by the Company or any of its subsidiaries); (c) all obligations of such Person that are not characterized as current liabilities under GAAP; (d) all obligations in respect of letters of credit, whether or not drawn, and bankers' acceptances issued for the account of such Person; (e) all capital lease obligations of such Person determined in accordance with GAAP; (f) all obligations of such Person secured by a contractual lien; (g) all guarantees of such Person in connection with any of the foregoing; or (h) any accrued interest, prepayment premiums or penalties or other costs or expenses related to any of the foregoing.

"Insider" means (a) any officer, manager, director or shareholder of the Company; (b) any individual related by blood, marriage or adoption to any individual listed in clause (a) hereof; or (c) any Person in which any individual listed in clauses (a) or (b) hereof has a beneficial interest.

"Knowledge" means the knowledge of such Person after reasonable inquiry, and "Knowledge" as it is applied to the Company means the knowledge of William Rawson, Gerry

Lefavor and such other individuals as identified by the Purchaser to the Company and set forth on <u>Schedule 8.1</u>.

"<u>Laws</u>" means all statutes, laws, codes, ordinances, regulations, rules, orders, judgments, writs, injunctions, acts or decrees of any Government Entity.

"<u>Liability</u>" or "<u>Liabilities</u>" means any liability or obligation of whatever kind or nature (whether known or unknown, whether asserted or unasserted, whether absolute or contingent, whether accrued or unaccrued, whether liquidated or unliquidated, and whether due or to become due).

"<u>Lien</u>" or "<u>Liens</u>" means any mortgage, pledge, security interest, right of first refusal, option, encumbrance, lien or charge of any kind (including any conditional sale or other title retention agreement or lease in the nature thereof), any sale of receivables with recourse against the Company, any filing or agreement to file a financing statement as debtor under the Uniform Commercial Code or any similar statute, or any subordination arrangement in favor of another Person.

"<u>Material Adverse Effect</u>" means any event, change, circumstance, effect, or state of facts that, when considered individually or in the aggregate, is, or is likely to be, materially adverse to (a) the Business, financial condition, prospects, or results of operations of the Company, taken as a whole, or (b) the ability of the Company or the Shareholder to perform their obligations under this Agreement or to consummate the transactions contemplated by this Agreement.

"<u>Material Contract</u>" means, with respect to the Business, (a) any Contract for the acquisition or sale of any securities or any substantial portion of the assets or business of or to any other Person whether completed or pending; (b) any continuing Contract that requires the Company to purchase materials, supplies, equipment, services or data involving in the case of any such Contract or agreement more than $50,000 over the remaining life of such Contract or $25,000 per annum; (c) any customer Contract with annual revenues in excess of $25,000; (d) any customer Contract with a Government Entity or branch of the military; (e) any indenture, mortgage, note, loan agreement, equipment financing agreement, installment obligation, or other Contract, agreement or instrument relating to Indebtedness; (f) any Contract for capital expenditures with remaining obligations in excess of $25,000; (g) any Contract that contains non-competition, non-solicitation, or other similar provisions; (h) any confidentiality, secrecy, or non-disclosure agreement entered into outside the Ordinary Course of Business; (i) any Contract involving payments during a twelve (12) month period of $25,000 or more, pursuant to which the Company is a lessor or lessee of any real property, machinery, equipment, motor vehicles, office furniture, fixtures or other personal property; (j) any Contract involving a Related Party Transaction; (k) any Contract to provide a guaranty, indemnification, reimbursement, contribution, assumption or endorsement of, or any substantially similar commitment with respect to, the obligations, Liabilities or Indebtedness of any other Person except Contracts containing standard indemnification provisions entered into in the Ordinary Course of Business; (l) any investment banking, placement, broker or substantially similar Contract; (m) any Contract with any Government Entity, other than a customer Contract or zoning or land use agreements entered into in the Ordinary Course of Business; (n) any consulting Contract involving payments during any twelve (12) month period of $25,000 or more; (o) any distribution, reseller, dealer, agency, franchise, advertising, revenue sharing, alliance, joint venture, marketing or similar

Contract of the Company; (p) any employment, independent contractor or similar agreement that provides for payments or benefits, or otherwise triggers material obligations, in any case solely as a result of the consummation of any of the transactions contemplated by this Agreement; (q) any Contract that contemplates the payment of royalties, commissions, or other payments based on provision of services or sales of products, whether related to licensing or development of Intellectual Property or otherwise; or (r) any Contract that individually, or collectively with related Contracts, represents a material portion of the Company's revenue or is otherwise material to the Business.

"Ordinary Course of Business" means the ordinary course of business of the Company, consistent with past practice, including with regard to nature, frequency and magnitude.

"Organizational Documents" means the articles or certificate of incorporation or organization, bylaws, limited liability company agreement, partnership agreement or other governing documents of an entity.

"Outstanding Transaction Expenses" means fees and expenses payable by or on behalf of the Company or the Shareholder relating to the negotiation, execution and delivery of any letter of intent or term sheet, this Agreement and any other Transaction Documents, as well as the consummation of the transaction contemplated hereby and thereby, that are incurred by or on behalf, or charged to the Company or the Shareholder, including all legal, tax, accounting, financial and other advisory and consulting fees, the payment of any assignment or consent fees, and other amounts that may become payable by the Company or the Shareholder in connection with the negotiation, execution and delivery of this Agreement and the other Transaction Documents or the consummation of the transactions contemplated hereby and thereby.

"Person" means an individual, a partnership, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization and a Government Entity.

"Related Party Transaction" means any Contract, arrangement, or understanding under which the Company or any of its Insiders (a) has borrowed any monies from or has outstanding any Indebtedness or other similar obligations to the Company or its Affiliates; (b) owns any direct or indirect interest of any kind in, or is a governor, director, manager, officer, member, employee, partner, equity owner, consultant or lender to, or borrower from, or has the right to participate in the management, operations or profits of, any Person that (x) is a competitor, supplier, customer, distributor, lessor, tenant, creditor or debtor of the Company, or (y) participates in any transaction to which the Company is a party; or (c) is or has been a party to any Contract, arrangement, understanding or transaction with the Company.

"Release" shall have the meaning specified in 42 U.S.C. § 9601.

"Remediation Action" means any action to mitigate, remediate, monitor or otherwise respond to a Release of Hazardous Substances.

"Tax" or "Taxes" means federal, state, county, local, foreign or other income, gross receipts, *ad valorem*, franchise, profits, sales or use, transfer, registration, excise, utility, environmental, communications, real or personal property, capital stock, license, payroll, wage

- 36 -

or other withholding, employment, social security, severance, stamp, occupation, alternative or add-on minimum, estimated and other taxes of any kind whatsoever (including deficiencies, penalties, additions to tax, and interest attributable thereto) whether disputed or not.

"Tax Return" means any return, information report or filing with respect to Taxes, including any schedules attached thereto and including any amendment thereof.

"Title Company" means a title company selected by Purchaser.

"Working Capital Target" means an amount equal to an amount mutually agreed to by the Purchaser and the Company prior to the Closing.

# ARTICLE IX
## Miscellaneous

9.1.    Fees and Expenses.  The Purchaser will be responsible for all costs and expenses incurred by the Purchaser and its Affiliates in connection with the negotiation, preparation and entry into this Agreement and the consummation of the transactions contemplated hereby.  The Company will be responsible for costs and expenses incurred by the Company and the Shareholder in connection with the negotiation, preparation and execution of this Agreement and the consummation of the transactions contemplated hereby.  In addition, the parties agree and acknowledge that the Company will be responsible for all costs incurred by the Purchaser and its Affiliates in connection with the costs of preparation of title commitments and ALTA surveys ordered in connection with the transactions contemplated by this Agreement.

9.2.    Remedies.  Except as expressly provided in this Agreement, any Person having any rights under any provision of this Agreement will be entitled to enforce such rights specifically (without posting a bond or other security), to recover Damages by reason of any breach of any provision of this Agreement and to exercise all other rights granted by Law.  Except as expressly provided in this Agreement, all such rights and remedies will be cumulative and non-exclusive, and may be exercised singularly or concurrently.  The parties acknowledge that any breach of this Agreement may cause substantial irreparable harm to the other party.  Therefore, this Agreement may be enforced in equity by specific performance, temporary restraining order and/or injunction.  The rights to such equitable remedies will be in addition to all other rights or remedies that a party may have under this Agreement or under applicable Law.

9.3.    Consent to Amendments; Waivers.  This Agreement may be amended, or any provision of this Agreement may be waived upon the approval, in writing, executed by the Purchaser and the Company.  No course of dealing between or among the parties hereto will be deemed effective to modify, amend or discharge any part of this Agreement or any rights or obligations of any such party or such holder under or by reason of this Agreement.

9.4.    Successors and Assigns; Public Disclosure.  This Agreement and all of the provisions hereof will be binding upon and inure to the benefit of the parties hereto and their respective successors and permitted assigns, except that neither this Agreement nor any of the rights, interests or obligations under this Agreement may be assigned or delegated by the

Company or the Shareholder without the prior written consent of the Purchaser. Notwithstanding the foregoing, (a) the Purchaser may assign in whole or in part its rights and obligations pursuant to this Agreement to one or more of its Affiliates, (b) the Purchaser may assign this Agreement and its rights and obligations under this Agreement in connection with a merger or consolidation involving the Purchaser, or in connection with a sale of substantially all of the equity or assets of the Purchaser or other disposition of substantially all of the Business, and (c) the Purchaser may assign any or all of its rights pursuant to this Agreement or the ancillary documents hereto, including its rights to indemnification, to any of its lenders as collateral security. Neither the Company nor the Shareholder will release any public statement concerning this Agreement or the transactions contemplated hereby without the prior written consent of the Purchaser except as may be required by applicable Law.

9.5. <u>Severability</u>. Whenever possible, each provision of this Agreement will be interpreted in such manner as to be effective and valid under applicable Law, but if any provision of this Agreement or the application of any such provision to any Person or circumstance is held to be prohibited by, illegal or unenforceable under applicable Law or rule in any respect by a court of competent jurisdiction, such provision will be ineffective only to the extent of such prohibition, illegality or unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Agreement. Furthermore, in lieu of such illegal, invalid or unenforceable provision, there will be added automatically as a part of this Agreement a legal, valid and enforceable provision as similar in terms to such illegal, invalid, or unenforceable provision as may be possible.

9.6. <u>Counterparts</u>. This Agreement may be executed in counterparts (including by means of facsimile or pdf signature pages), any one of which need not contain the signatures of more than one party, but all such counterparts taken together will constitute one and the same agreement.

9.7. <u>Entire Agreement</u>. This Agreement and the agreements and documents referred to herein contain the entire agreement and understanding among the parties hereto with respect to the subject matter hereof and supersede all prior agreements and understandings, whether written or oral, relating to such subject matter in any way, including, without limitation, any confidentiality agreement.

9.8. <u>Governing Law; Forum; Waiver of Jury</u>. All issues and questions concerning the construction, validity, enforcement and interpretation of this Agreement and the Schedules and Exhibits hereto will be governed by, and construed in accordance with, the Laws of the State of Delaware without giving effect to any choice of law or conflict of law rules or provisions (whether of the State of Delaware or any other jurisdiction) that would cause the application of the Laws of any jurisdiction other than the State of Delaware. In furtherance of the foregoing, the internal Laws of the State of Delaware will control the interpretation and construction of this Agreement (and all Schedules and Exhibits hereto), even though under that jurisdiction's choice of law or conflict of law analysis, the substantive Law of some other jurisdiction would ordinarily apply. Any judicial proceeding brought with respect to this Agreement must be brought in any court of competent jurisdiction in the State of Delaware, and, by execution and delivery of this Agreement, each party (a) accepts, generally and unconditionally, the exclusive jurisdiction of such courts and any related appellate court, and irrevocably agrees to be bound by any judgment rendered thereby in connection with this Agreement, and (b) irrevocably waives

any objection it may now or hereafter have as to the venue of any such suit, action or proceeding brought in such a court or that such court is an inconvenient forum. Nothing in this Section, however, shall affect the right of any party to serve legal process in any other manner permitted by law or at equity. Each party agrees that a final judgment in any action or proceeding so brought shall be conclusive and may be enforced by suit on the judgment or in any other manner provided by law or at equity. EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN RESPECT OF ANY LEGAL ACTION ARISING OUT OF OR RELATING TO THIS AGREEMENT.

9.9. <u>Attorney-Client Privilege</u>. The parties intend that, at all times after the Closing, the Purchaser shall have the right in its discretion to assert or waive any attorney work product protections, attorney-client privileges and similar protections and privileges relating to the Assets and Assumed Liabilities.

9.10. <u>Construction</u>. The parties hereto have participated jointly in the negotiation and drafting of this Agreement. In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the parties hereto and no presumption or burden of proof shall arise favoring or disfavoring any party by virtue of the authorship of any of the provisions of this Agreement. Any reference to any federal, state, local, or foreign statute or law shall be deemed also to refer to all rules and regulations promulgated thereunder, unless the context requires otherwise.

9.11. <u>Notices</u>. All notices, demands or other communications to be given or delivered under or by reason of the provisions of this Agreement will be in writing and will be deemed to have been given when delivered personally to the recipient or when sent by facsimile (with confirmation of receipt), or one day after being sent to the recipient by reputable overnight courier service (charges prepaid). Such notices, demands and other communications will be sent to the Purchaser, the Company, the Shareholder and the Joinder Parties at the addresses indicated below or to such other address or to the attention of such other Person as the recipient party has specified by prior written notice to the sending party. All notices, demands and other communications hereunder may be given by any other means (including electronic mail), but will not be deemed to have been duly given unless and until it is actually received by the intended recipient.

To the Company, the Shareholder and the Joinder Parties:

Cardwell Distributing, Incorporated
c/o UFS Management
3950 S 700 E, Suite 100
Salt Lake City, UT 84107
Attn: Jason Foulger, General Counsel
Fax: (801) 290-2093
Email: Jason.foulger@ufsupply.com

- 39 -

To the Purchaser:

> RelaDyne West, LLC
> 9395 Kenwood Road, Suite 104
> Blue Ash, Ohio 45242
> Attn: Larry Stoddard, President and CEO
> Fax: (513) 489-0401
> Email: larry.stoddard@reladyne.com

with a copy to (which will not constitute notice to the Purchaser):

> Fredrikson & Byron, P.A.
> 200 South Sixth Street, Suite 4000
> Minneapolis, MN 55402-1425
> Attn: Sean P. Kearney
> Fax: (612) 492-7077
> Email: skearney@fredlaw.com

> and

> Audax Management Company, LLC
> 101 Huntington Avenue
> Boston, MA 02199
> Attn: General Counsel
> Fax: (617) 859-1600

[*Signature Page Follows*]

IN WITNESS WHEREOF, the parties hereto have executed this Asset Purchase Agreement on the date first written above.

**RELADYNE WEST, LLC**

By: _____

Name: LARRY STODDARD

Title: CEO

**CARDWELL DISTRIBUTING, INCORPORATED**

By: _____

Name: Jacob Kingston

Title:

**UNITED FUEL SUPPLY L.L.C.**

By: _____

Name: Jacob Kingston

Title: CEO

**JOINDER PARTIES**

_____

Isaiah Kingston

_____

Jacob Kingston

Exhibit A

| Net Working Capital Peg Analysis ($ 000's) | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | *LTM* | *Closing* |
| **Description** | **Aug15** | **Sep15** | **Oct15** | **Nov15** | **Dec15** | **Jan16** | **Feb16** | **Mar16** | **Apr16** | **May16** | **Jun16** | **Jul16** | **Average** | **Balance** |
| Cash & Equivalents | 1,340 | 403 | 1,021 | 966 | 1,106 | 271 | 222 | 835 | 410 | 914 | 1,061 | 973 | 794 | 3,864 |
| Accounts Receivable, Net | 9,007 | 9,864 | 9,692 | 10,403 | 8,994 | 6,757 | 6,263 | 5,867 | 6,552 | 7,594 | 8,926 | 8,608 | 8,211 | 8,449 |
| Inventory, net | 6,904 | 6,802 | 7,018 | 6,460 | 6,285 | 5,905 | 5,680 | 5,682 | 5,947 | 5,626 | 5,842 | 5,780 | 6,161 | 6,114 |
| Other Current Assets | 422 | 517 | 578 | 540 | 427 | 580 | 472 | 411 | 542 | 424 | 416 | 328 | 471 | 447 |
| Current Assets | 17,673 | 17,586 | 18,308 | 18,370 | 16,811 | 13,514 | 12,637 | 12,795 | 13,450 | 14,558 | 16,245 | 15,690 | 15,636 | 18,875 |
| Accounts Payable | 8,125 | 8,971 | 8,235 | 7,165 | 6,406 | 5,402 | 5,316 | 6,288 | 7,269 | 6,903 | 7,543 | 7,425 | 7,087 | 8,016 |
| Accrued Expenses | 612 | 725 | 877 | 785 | 310 | 523 | 611 | 785 | 700 | 782 | 684 | 753 | 679 | 1,400 |
| Revolving Line of Credit | 2,722 | 1,446 | 3,467 | 5,157 | 4,526 | 2,081 | 1,149 | 137 | 278 | 1,305 | 2,038 | 2,107 | 2,201 | 3,535 |
| Current Portion of Long-term Debt | 303 | 306 | 347 | 348 | 349 | 351 | 352 | 353 | 355 | 356 | 357 | 497 | 356 | 496 |
| Current Liabilities | 11,761 | 11,448 | 12,926 | 13,454 | 11,592 | 8,357 | 7,428 | 7,563 | 8,602 | 9,346 | 10,622 | 10,782 | 10,323 | 13,447 |
| **Reported NWC** | **5,912** | **6,138** | **5,382** | **4,916** | **5,219** | **5,156** | **5,209** | **5,232** | **4,848** | **5,212** | **5,624** | **4,908** | **5,313** | **5,428** |
| | | | | | | | | | | | | | | |
| *Definitional adjustments* | | | | | | | | | | | | | | |
| Cash & equivalents | (1,340) | (403) | (1,021) | (966) | (1,106) | (271) | (222) | (835) | (410) | (914) | (1,061) | (973) | (794) | (3,864) |
| Interest payable | 7 | 4 | 7 | 9 | 10 | 8 | 4 | 1 | 1 | 3 | 4 | 7 | 5 | - |
| Revolving line of credit | 2,722 | 1,446 | 3,467 | 5,157 | 4,526 | 2,081 | 1,149 | 137 | 278 | 1,305 | 2,038 | 2,107 | 2,201 | 3,535 |
| Current portion of long-term debt | 303 | 306 | 347 | 348 | 349 | 351 | 352 | 353 | 355 | 356 | 357 | 497 | 356 | 496 |
| Sales tax payable | 241 | 270 | 339 | 268 | 292 | 395 | 419 | 508 | 443 | 477 | 577 | 615 | 404 | 902 |
| Allowance For Bad Debts | 544 | 564 | 584 | 356 | 356 | 356 | 297 | 297 | 297 | 297 | 297 | 297 | 379 | 225 |
| Total definitional adjustments | 2,477 | 2,187 | 3,723 | 5,172 | 4,428 | 2,919 | 2,001 | 460 | 965 | 1,524 | 2,212 | 2,551 | 2,552 | 1,293 |
| **Definitional NWC** | **8,389** | **8,325** | **9,106** | **10,087** | **9,647** | **8,076** | **7,210** | **5,693** | **5,813** | **6,736** | **7,836** | **7,459** | **7,865** | **6,721** |
| | | | | | | | | | | | | | | |
| **Proposed NWC Peg** | | | | | | | | | | | | | **7,865** | **(1,143)** |

**AMENDMENT NO. 1 TO**
**ASSET PURCHASE AGREEMENT**

This AMENDMENT NO. 1 TO ASSET PURCHASE AGREEMENT (this "Amendment"), dated as of September 28, 2016, by and among RelaDyne West, LLC, a Delaware limited liability company (the "Purchaser"), and Cardwell Distributing, Incorporated, a Utah corporation (the "Company").

**RECITALS**

WHEREAS, the Purchaser, the Company, United Fuel Supply L.L.C., a Nevada limited liability company and shareholder of the Company, and for limited purposes, each of Isaiah Kingston and Jacob Kingston are parties to that certain Asset Purchase Agreement dated September 2, 2016 (the "Purchase Agreement");

WHEREAS, the Purchaser and the Company wish to amend the Purchase Agreement in the manner set forth in this amendment; and

WHEREAS, Section 9.3 of the Purchase Agreement requires that any amendment to the Purchase Agreement must be in writing and executed by the Purchaser and the Company.

**AGREEMENT**

NOW, THEREFORE, in consideration of the premises and the mutual covenants of the parties set forth in this Amendment and in the Purchase Agreement and for other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties hereby agree as follows:

1.      Amendment to Section 1.1.  The following subsection (n) is added to Section 1.1 of the Purchase Agreement:

"(n)    all Cash."

2.      Amendment to Section 1.2(a).  Section 1.2(a) of the Purchase Agreement is hereby deleted in its entirety and amended and restated as follows:

"(a)    Intentionally Omitted."

3.      Amendment to Section 1.3(a).  Section 1.3(a) of the Purchase Agreement is hereby deleted in its entirety and amended and restated as follows:

"At the Closing, the Company will assign and delegate to the Purchaser, and the Purchaser will assume, only the following Liabilities: (i) the Company's accounts payable set forth on Schedule 1.3(a)(i) (the "Accounts Payable"), (ii) the Company's obligations under the Purchased Contracts, and (c) the Liabilities set forth on Schedule 1.3(a)(ii) (collectively, the "Assumed Liabilities")."



4.    Amendment to Section 1.4. Section 1.4 of the Purchase Agreement is hereby deleted in its entirety and amended and restated as follows:

"Purchase Price. The consideration for the Assets will be the sum of (i) Nineteen Million Dollars ($19,000,000) (the "Enterprise Value"), plus (ii) the Closing Cash Amount, plus (iii) the amount of the vehicle payoffs set forth in Schedule 1.4, and (iv) adjusted (plus or minus) by the Working Capital Adjustment as provided in Section 1.7 hereof (collectively, the "Purchase Price")."

5.    Amendment to Section 1.5(b). Section 1.5(b) of the Purchase Agreement is hereby deleted in its entirety and amended and restated as follows:

"(b)    the Purchaser will pay an amount equal to One Million Nine Hundred Thousand Dollars ($1,900,000) (the "Escrow Amount"), with such funds to be held in an escrow account and released pursuant to the terms and conditions of an escrow agreement by and among the Purchaser, the Company and the Escrow Agent (the "Escrow Agreement"). (For the avoidance of doubt, the parties acknowledge and agree that One Million Four Hundred Thousand Dollars ($1,400,000) of the Escrow Amount will be released to the Company within two (2) business days following the date that the Purchaser has obtained the R&W Insurance Policy provided that the Purchaser has not made any claim for indemnification pursuant to Article V prior to such date.) Notwithstanding anything to the contrary contained in this Agreement, in the event that the Purchaser has not obtained the R&W Insurance Policy contemporaneously with Closing, the Purchaser will use commercially reasonable efforts to obtain such policy following the Closing."

6.    Amendment to Section 1.5(c). Section 1.5(c) of the Purchase Agreement is hereby deleted in its entirety and amended and restated as follows:

"(c)    the Purchaser will pay to the Company, by wire transfer of immediately available funds to such account as is designated by the Company, an aggregate amount equal to the sum of:

(i)    the Enterprise Value;

(ii)    plus the Estimated Closing Cash Amount;

(iii)    minus the amount of any Deposit (as such term is defined in the Deposit Agreement entered into between the Purchaser and the Company);

(iv)    minus the Estimated R&W Insurance Policy Premium;

(v)    minus the Indebtedness Amount;

(vi)    minus One Million Dollars ($1,000,000), which amount will be paid to the Company once the Purchaser's bank has issued a $1,000,000 letter of credit on behalf of the Purchaser for the benefit of Sinclair;

- 2 -



(vii)    <u>minus</u> the Escrow Amount; and

(viii)    <u>plus</u> or <u>minus</u> the Estimated Working Capital Adjustment.

5.    <u>Addition of Section 1.10</u>. The following <u>Section 1.10</u> of the Purchase Agreement is hereby added to the Purchase Agreement:

"1.10   <u>Closing Cash Amount Adjustment</u>.

(a)    Within three (3) business days prior to the Closing Date, the Company will deliver to the Purchaser a statement of the estimated Closing Cash Amount (the "<u>Estimated Closing Cash Amount</u>"). Provided that the Estimated Closing Cash Amount is acceptable to the Purchaser, the Purchase Price will be increased on a dollar-for-dollar basis by an amount equal to the Estimated Closing Cash Amount.

(b)    No later than one hundred fifty days (150) days after the Closing Date, the Purchaser will prepare and deliver to the Company a reasonably detailed statement (the "<u>Closing Cash Amount Statement</u>") of the Closing Cash Amount. Following the Closing Date, the Purchaser will cooperate with the Company and its advisors in making available to the Company and its advisors such books, records, financial information, work papers and supporting data, as reasonably requested by the Company, in connection with the Company's review of the Closing Cash Amount.

(c)    The Company may deliver a written notice to the Purchaser no later than twenty (20) days following the Company's receipt of the Closing Cash Amount Statement stating whether the Company has any objections to the Closing Cash Amount, describing in reasonable detail any objections thereto. Failure to give a timely objection notice (or written notification from the Company that it has no objection to the Closing Cash Amount Statement) will constitute acceptance and approval of the Closing Cash Amount set forth therein, and such Closing Cash Amount will be final and binding upon the parties.

(d)    If the Company notifies the Purchaser of any objection to the Closing Cash Amount Statement within the time period set forth in <u>Section 1.10(c)</u>, the Purchaser and the Company will attempt in good faith to reach an agreement as to the matter in dispute in accordance with the same dispute resolution process set forth in <u>Section 1.7(c)(iii)</u> with respect to any disputes related to the Closing Working Capital.

(e)    If the Closing Cash Amount as finally determined is greater than the Estimated Closing Cash Amount, the Purchaser will pay such excess on a dollar-for-dollar basis to the Company in immediately available funds, and if the Estimated Closing Cash Amount is greater than the Closing Cash Amount, the Company and the Shareholder will, jointly and severally, pay such excess on a dollar-for-dollar basis to the Purchaser in immediately available funds. In the Purchaser's sole discretion, any payment due from the Company and the Shareholder may be paid from the Escrow Amount. All payments pursuant to this <u>Section 1.10(e)</u> will be made within five (5) days after the determination of Closing Cash Amount becomes final and binding."

7.    <u>Addition of Section 1.11</u>. The following Section 1.11 of the Purchase Agreement is hereby added to the Purchase Agreement:

- 3 -

"1.11 R&W Insurance Policy Premium Adjustment. Within five (5) business days following the date that the Purchaser has obtained the R&W Insurance Policy, the Purchaser will deliver to the Company an invoice for the expenses related to the R&W Insurance Policy (the "R&W Insurance Policy Premium"). If the Estimated R&W Insurance Policy Premium is greater than the R&W Insurance Policy Premium, the Purchaser will pay such excess on a dollar-for-dollar basis to the Company in immediately available funds, and if the R&W Insurance Policy Premium is greater than the Estimated R&W Insurance Policy Premium, the Company and the Shareholder will, jointly and severally, pay such excess on a dollar-for-dollar basis to the Purchaser in immediately available funds.

8.      Amendment to Section 3.4(a). Section 3.4(a) of the Purchase Agreement is hereby deleted in its entirety and amended and restated as follows:

"(a)     Attached hereto as Schedule 3.4(a) are (i) the audited balance sheet of the Company as of December 31, 2015 and the audited income statement and statement of cash flows for the twelve (12) month period ended December 31, 2015, (ii) the audited balance sheet of the Company as of December 31, 2014 and the audited income statement and statement of cash flows for the twelve (12) month period ended December 31, 2014, and (iii) the unaudited balance sheet of the Company as of August 31, 2016 (the "Most Recent Balance Sheet") and the unaudited income statement and statement of cash flows for the eight-month period then ended. All of the foregoing financial statements are collectively referred to as the "Financial Statements.""

9.      Amendment to Section 3.16. Section 3.16 of the Purchase Agreement is hereby amended as follows:

a.      The reference to "the six-month period ended June 30, 2016" in the first sentence of Section 3.16 is hereby changed to "the eight-month period ended August 31, 2016".

b.      The reference to "June 30, 2016" in the second sentence of Section 3.16 is hereby changed to "August 31, 2016".

10.     Amendment to Section 3.18. The reference to "June 30, 2016" in the first sentence of Section 3.18 is hereby changed to "August 31, 2016".

11.     Amendment to Article VIII—Definition of "Working Capital Target". The definition of "Working Capital Target" in Article VIII of the Purchase Agreement is hereby deleted in its entirety and amended and restated as follows:

""Working Capital Target" means an amount equal to $7,865,000."

12.     Additions to Article VIII—Definitions of "Closing Cash Amount" and "Estimated R&W Insurance Policy Premium". The following definitions are added to Article VIII of the Purchase Agreement:

""Closing Cash Amount" means all Cash as of the Closing."

- 4 -

""Estimated R&W Insurance Policy Premium" means an amount equal to $225,000.

13.   Defined Terms.  Capitalized terms used but not otherwise defined in this Amendment shall have the respective meanings assigned to them in the Purchase Agreement.

14.   Full Force and Effect.  Except as expressly provided herein, this Amendment does not in any way change, modify or delete the provisions of the Purchase Agreement, and all such provisions shall remain in full force and effect.

15.   Miscellaneous.  Sections 9.2, 9.3, 9.4, 9.6, 9.8 and 9.10 of the Purchase Agreement are hereby incorporated by reference into this Amendment, *mutatis mutandis*, as if fully set forth herein.

[*Signature Page Follows*]



IN WITNESS WHEREOF, each party has executed and delivered this Amendment as of the date first written above.

**PURCHASER:**

RELADYNE WEST, LLC

By: _____

Name: Larry J. Stoddard
Title: Chief Executive Officer and President

**COMPANY:**

CARDWELL DISTRIBUTING, INCORPORATED

By: _____

Name: Jacob Kingston
Title: Director

IN WITNESS WHEREOF, each party has executed and delivered this Amendment as of the date first written above.

**PURCHASER:**

RELADYNE WEST, LLC

By: _____
Name: Larry J. Stoddard
Title:  Chief Executive Officer

**COMPANY:**

CARDWELL DISTRIBUTING, INCORPORATED

By: _____
Name:          Jacob Kingsman
Title: